Kevin J. Nash
Evan M. Lazerowitz
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, New York 10036
Telephone: (212) 221-5700
Facsimile:  (212) 335-4501

*Proposed Counsel for the Debtor*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>Joyce Leslie, Inc.<br><br>             Debtor. | Chapter 11<br><br>Case No. 16- 22035 (RDD) |

## DEBTOR'S MOTION FOR ORDERS (I)(A) AUTHORIZING ENTRY INTO AGENCY AGREEMENT WITH SB CAPITAL, AND APPROVING PROPOSED SELECT LEASE AGREEMENT WITH MADRAGS, (B) AUTHORIZING BIDDING PROCEDURES AND AUCTION AND (C) SCHEDULING SALE HEARING AND APPROVING NOTICE THEREOF; (II) AUTHORIZING (A) SALE OF ASSETS AND (B) STORE CLOSING SALES AND (III) GRANTING RELATED RELIEF

Joyce Leslie, Inc. (the "Debtor") hereby moves (the "Motion") for entry of orders

(a) authorizing the Debtor to enter into two proposed stalking horse contracts denominated as

follows: (i) that certain Agency Agreement, dated January 14, 2016 (the "Agency Agreement"),

attached hereto as **Exhibit A** (which is inclusive of the Sale Guidelines (the "Sale Guidelines"),

attached hereto as **Exhibit B**), between the Debtor and a joint venture composed of SB Capital

Group LLC, Tiger Capital Group, LLC, and 360 Debtor Solutions, LLC (together, "SB Capital")

providing for a liquidation sale of the Debtor's store inventory and furniture, fixtures, and

equipment, and (ii) that certain Asset Purchase Agreement (the "Select Lease Purchase

Agreement") dated January 14, 2016 with 618 Main Street Corp. an affiliate of Madrag/10 Spot

Clothing, Inc. (herewith, "Madrag"), attached hereto as **Exhibit C**, providing for the sale of up to

a minimum of 12 designated leases, and up to 20 of the designated leases, to close after

completion of the store liquidation sales (the Agency Agreement and Select Lease Purchase

Agreement are, collectively the "Stalking Horse Agreements"); (b) authorizing the related

bidding procedures for an auction to consider higher and better proposals for the liquidation

process and sale of leases; (c) scheduling a sale hearing and approving notice thereof (the

"Bidding Procedures Order", annexed hereto as **Exhibit D**); (d) approving the auction results and

authorizing (i) sale of Assets (defined below) and (ii) store closing sales, and (e) granting related

relief, including approval of a pre-petition consulting agreement with SB Capital (the "Approval

Order").  In support of the Motion, the Debtor represents as follows:

### Background

1.      On January 9, 2016 (the "Petition Date"), the Debtor commenced its

Chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11

of the Bankruptcy Code.  The Debtor continues to manage and operate its business as a debtor-

in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.   No official

committee of unsecured creditors has yet been appointed in this Chapter 11 case but one is

expected to be formed by the return date hereof.

2.      The factual background regarding the Debtor, including its business

operations, capital and debt structure, and the events leading up to the filing of this Chapter 11

case, are set forth in detail in the First Day Declaration and accompanying bankruptcy petition

and schedules (*See* Dkt. No. 1).

3.     The Debtor operates a chain of 47 women's retail clothing stores located throughout New York, New Jersey, Pennsylvania, and Connecticut. Five of those stores[1] are slated to close on or before January 31, 2016, based upon a pre-petition agency agreement with SB Capital. Thus, this Motion is aimed at establishing procedures to sell the Debtor's assets relating to its remaining 42 stores (chiefly inventory, furniture, fixtures and equipment [FF&E] and leases). The Motion will run in tandem with the Debtor's continuing efforts to solicit a potential going concern buyer for the company. However, since the Debtor has looked for a possible going concern buyer for over a year's time without success, the prospects do not appear bright. Nevertheless, with the Debtor's Chapter 11 filing, there is renewed hope that a going concern buyer could emerge to bid at the Auction[2] and make a bid on the company as a going concern buyer to save as many jobs as possible.

4.     In the interim, the Debtor must also prepare to pursue liquidation and lease sales and has negotiated two stalking horse contracts to establish a baseline price at the Auction with respect to liquidation bids and/or bids to acquire leases once the stores are emptied of inventory. Proceeding on a dual track will promote asset recoveries and minimize expenses.

5.     The first proposed stalking horse, SB Capital, is comprised of well-known liquidation firms and is prepared to conduct going out of business sales at the Debtor's 42 locations, utilizing many of the Debtor's current store employees. Under the Agency Agreement, the Debtor stands to receive a guaranteed minimum payment of 62% of the cost value of its remaining inventory at the start of liquidation, plus 50% of additional revenues

---

[1] The five closing locations are (i) Store #6 in Morris Plains, NJ; (ii) Store #7 in Carle Place, NY; (iii) Store #12 in Jersey City, NJ; (iv) Store #56 in Bricktown, NJ; and (v) Store #87 in Ridgewood, NY (collectively, the "Closing Stores").

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agency Agreement or the Select Lease Purchase Agreement, as applicable.

generated from the liquidation after reimbursement of expenses and payment of an agency fee.
Pre-petition, SB Capital was engaged to conduct going out of business sales for five locations on
a fee basis (as opposed to a guaranteed minimum) and has performed well in that role.

6.      Since these going out of business sales are continuing but about to come to
an end, the Debtor requests that the Court formally approve the assumption of the Debtor's
existing Consulting Agreement with SB Capital (attached hereto as **Exhibit E**).  Pursuant to the
Consulting Agreement, SB Capital began going out of business sales at the 5 locations on
November 14, 2015, and same will be completed by the end of January, if not sooner.  SB
Capital receives a fee equal to 2% of the gross proceeds of the sale of merchandise at each of the
Closing Stores, and 15% of the proceeds from the sale of FF&E.  The terms of the Consulting
Agreement are reasonable and customary, and SB Capital's services are necessary to conclude
store closing sales already in progress at the Closing Stores.

7.      Given the existing relationship, it was logical for the Debtor to concentrate
on SB Capital to negotiate a stalking horse agreement to liquidate the remaining stores.   Since
that time, the Debtor has also been in contact with other national liquidation firms and they will
be given notice of the bidding procedures, and hopefully competing bids will be received from
other liquidators at the Auction.

8.      The Debtor also sees value in its store leases and is soliciting a bid from a
separate lease buyer(s) or multiple lease buyer(s) for all or some of its locations.  Again, to jump-
start the process, the Debtor has entered into a stalking horse contract with Madrag (defined
herein as the "Select Lease Purchase Agreement"), which provides that Madrag will purchase a
minimum of 12 designated store leases, together with the associated fixtures, and intellectual
property, for a purchase price of $720,000, plus the funding of all pre-petition rent arrears.

4

Madrag may, in its discretion, also purchase up to an additional 8 leases for an additional

$60,000 per lease, plus the funding of pre-petition rent arrears (for a total of 20).

9.      SB Capital recognizes the Madrag offer described above and has carved

out, at the Debtor's option, the FF&E in some or all of the stores listed in Schedule 15(a) to the

Agency Agreement (the "Excluded Store FF&E").

10.     The Debtor hopes to obtain approval of the respective stalking horse

contracts on January 26, 2016, complete an Auction by February 3, 2016, and obtain entry of the

Approval Order by February 4, 2016.  Entry of the Approval Order by February 4 is imperative

because SB Capital needs to commence liquidation sales before the start of the following

weekend (February 6-7) to maximize asset recoveries.

A.      **Summary of the Agency Agreement**

11.     Pursuant to the Agency Agreement, SB Capital will serve as the Debtor's

exclusive agent to (a) sell the remaining merchandise (the "Merchandise") located at the

Debtor's 42 retail locations (the "Sale") and (b) dispose of any owned fixtures, furnishings and

equipment (the "Owned FF&E") in the retail locations, warehouse and corporate offices

(together with the Sale, the "Transaction").  The Sale will include inventory and merchandise,

furniture, fixtures and equipment, and assignment of real property store leases (each, an "Asset

Class" and collectively, the "Assets"), either on a going-concern basis or via chain-wide store

closing sale program (the "Store Closing Sales").

12.    The significant terms of the Agency Agreement are as follows:[3]

| Provision | Description of Provision |
|---|---|
| Sale | SB Capital shall be retained as the Debtor's exclusive agent for the purpose of (a) selling the Merchandise located in the Debtor's retail store location(s) identified on Exhibit A-1 to the Agency Agreement, less the five Excluded Stores currently undergoing going out of business sales and slated to close on or before January 31, 2016; and (b) selling all of the Owned FF&E located in the Stores and the Debtor's corporate offices, by means of a "going out of business," "store closing", "sale on everything", "everything must go", or similarly themed sale.

"Merchandise" means all new first quality (other than as expressly set forth), finished goods inventory that is owned by Debtor, customarily sold to customers in the ordinary course of Debtor's business and located in the Stores on the Sale Commencement Date (or, with respect to Returned Merchandise, received in the Stores by the dates specified in this Agreement), including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date; (iii) Display Merchandise; and (iv) Defective Merchandise (to the extent Debtor and SB Capital can mutually agree on the Cost Value applicable thereto).

*See* Agency Agreement Section 5.2(a). |
| Guaranteed Amount | SB Capital guarantees that Debtor shall receive an amount (the "<u>Guaranteed Amount</u>") equal to sixty-two percent (62%) (the "<u>Guaranty Percentage</u>") of the aggregate Cost Value of Merchandise. The Guaranteed Amount will be calculated based upon the product of (x) the Guaranty Percentage *multiplied by* (y) the aggregate Cost Value of the Merchandise (in the case of (y), as determined by (A) the Final Inventory Report at the conclusion of the Inventory Taking by the Inventory |

---

[3] This summary is provided in accordance with Local Rule 6004-1 and General Order M-383, and is qualified in its entirety by reference to the provisions of the Agency Agreement and the Sale Guidelines. Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the Agency Agreement and the Sale Guidelines. To the extent there exists any inconsistency between this summary and the provisions of the Agency Agreement and the Sale Guidelines, the provisions of the Agency Agreement and the Sale Guidelines, as applicable, shall control.

| Provision | Description of Provision |
|---|---|
|  | Taking Service after verification and reconciliation thereof by Debtor and SB Capital, (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement), (C) the aggregate Cost Value of Display Merchandise included in the Sale; and (E) the aggregate Cost Value of Returned Merchandise included in the Sale and not otherwise included in the Inventory Taking. SB Capital shall pay to Debtor (or its designee) the Guaranteed Amount on the first business day after entry of the Approval Order.<br><br>*See* Agency Agreement Sections 3.1(a), 3.1(c), 3.3. |
| Sharing Amount | To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, plus (y) Expenses of the Sale, plus (z) an amount equal to the sum of (i) six percent (6%) of the sum of the aggregate Cost Value of the Merchandise included in the Sale; plus (ii) five percent (5%) of the gross sale Proceeds from the sale of Additional Agent Merchandise (exclusive of sale taxes) (the amount set forth in clause (z), the "<u>Agent's Fee</u>" and the sum of clauses (x), (y) and (z) being collectively defined as the "<u>Sharing Threshold</u>"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Debtor (Debtor's share of Proceeds beyond the Sharing Threshold is the "<u>Sharing Amount</u>") and fifty percent (50%) to SB Capital.<br><br>*See* Agency Agreement Section 3.1(b). |
| Additional Merchandise | All Merchandise and Additional Agent Merchandise remaining at the conclusion of the Sale ("<u>Remaining Merchandise</u>") shall become the property of SB Capital, free and clear of all liens, claims, interests and encumbrances of any kind or nature; <u>provided</u>, <u>however</u>, the proceeds realized upon a sale or other disposition of the Remaining Merchandise shall constitute Proceeds hereunder for purposes of, *inter alia*, calculating the Sharing Amount (if any) the due the Debtor.<br><br>SB Capital shall be entitled to include in the Sale supplemental merchandise procured by SB Capital which is of like kind, and no lesser quality than Merchandise located in the stores (the "Additional Agent Merchandise"). |

| Provision | Description of Provision |
|---|---|
| | *See* Agency Agreement Sections 3.2 and 8.9. |
| Sale of Owned FF&E | With respect to Owned FF&E, SB Capital shall, at the Debtor's election (the "FF&E Sale Option"), either (i) sell the Owned FF&E strictly on a commission basis (the "FF&E Commission Option"), or (ii) sell the Owned FF&E on a guaranteed fee basis (the "FF&E Guaranty Option"); provided that, the FF&E Guaranty Option shall be subject to the Debtor and SB Capital agreeing on a mutually acceptable FF&E/asset listing.<br><br>*See* Agency Agreement Section 15(a). |
| Cost Value of Merchandise | The Guaranty Percentage has been fixed based upon the Debtor's statement that the aggregate Cost Value of the Merchandise is not less than $3,000,000 and not greater than $3,500,000, subject to certain adjustments if the Cost Value changes.<br><br>See Agency Agreement Section 3.1(c). |
| Store Closing Sales Expenses | SB Capital will pay Expenses of the Sale to the extent set forth in Section 4.1 of the Agency Agreement.  In addition, the Debtor may be liable for budgeted expenses incurred in connection with the Sale of FF&E, in the event that it elects to execute the FF&E Commission option.<br><br>*See* Agency Agreement Sections 4 and 15. |

| Provision | Description of Provision |
|---|---|
| Sale Period | The Sale shall commence at each of the stores on the first business day after the entry of the Approval Order, but not later than February 5, 2016 (the "Sale Commencement Date").  SB Capital shall complete the Sale on or before March 31, 2016 (the "Sale Termination Date"). The Sale Termination Date as to any Store may be (a) extended by mutual written agreement of the Debtor, in consultation with SB Capital or (b) accelerated by SB Capital, in which case SB Capital shall provide the Debtor with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice").  If SB Capital fails to provide the Debtor with timely notice of an acceleration of the Sale Termination Date for a Store, SB Capital shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice.<br><br>*See* Agency Agreement Section 6. |
| Bidding Protections | SB Capital shall receive (1) a breakup fee of $75,000, (the "Bid Protections") plus (2) reimbursement of the reasonable costs, fees, and expenses actually incurred and paid by SB Capital in acquiring signage and other advertising and promotional material in connection with the Sale (excluding any cost of capital incurred in connection therewith), in an aggregate amount not to exceed $60,000 (the "Signage Costs Reimbursement"). *See* Agency Agreement Section 16.11. |
| Store Lease Assumption | The Debtor shall not assign, reject or otherwise terminate any lease relating to any Store where such assignment, rejection, or termination would have an effective date on or prior to the applicable Sale Termination Date or Vacate Date for such Store<br><br>*See* Agency Agreement Section 2(b)(xxvi)(B). |
| Superpriority Liens | Subject to the SB Capital having satisfied its obligation to tender payment of the Initial Guaranty Payment and to deliver the Letter of Credit, any amounts owed by the Debtor to the SB Capital shall be granted the status of superpriority claims senior to all other superpriority |

| Provision | Description of Provision |
|---|---|
| | claims; provided that until the Debtor receives payment in full of the Guaranteed Amount, the Sharing Amount (if any), Expenses, the proceeds realized upon a sale of Owned FF&E (less the Agent FF&E Commission) or the FF&E Guaranty Amount, as applicable, and such other amounts due to the Debtor, any superpriority claim granted to the SB Capital (other than any such claim for the Bid Protections and Bid Reimbursements), shall be junior and subordinate to the security interests and superpriority claims any existing security interest and superpriority claim, but solely to the extent of the amount of the unpaid portion of such amounts and such other amounts due to the Debtor. Upon payment of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit, the Debtor grants to the SB Capital first priority, senior security interests in and liens (subject to certain subordination provisions) upon: (i) the Merchandise; (ii) the Additional Agent Merchandise; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the SB Capital's commission regarding the sale or other disposition of Merchant Consignment Goods; (v) in the event the Debtor elects the FF&E Guaranty Option, the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E after payment of the FF&E Guaranty Amount; or, alternatively, the SB Capital's FF&E Commission; (vi) the SB Capital's percentage share of Proceeds in excess of the Sharing Threshold, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing to secure the full payment and performance of all obligations of the Debtor to the SB Capital. *See* Agency Agreement Sections 2(b)(xii) and 16.12. |

B.    **Summary of the Select Lease Purchase Agreement**

13.    On the lease side, the significant terms of the Select Lease Purchase

Agreement are as follows:

| Provision | Description of Provision |
|---|---|
| **Sale** | Madrag's assumption and assignment of a minimum of 12 designated store leases, and up to 8 additional store leases, together with all existing FF&E at the designated sites, plus the Debtor's intellectual property, assets, trademarks, and trade names.<br><br>*See* Select Lease Purchase Agreement, Article 1, Sections 1-2. |
| **Consideration** | $720,000, plus funding of pre-petition rent cure amounts. Each additional lease above the minimum of 12 to be acquired for $60,000, plus the funding of pre-petition rent cure amounts.<br><br>*See* Select Lease Purchase Agreement, Article 2, Sections 1-3. |
| **Designation Period** | Leases to be designated by Madrag no later than 5 days prior to the start of the Auction.<br><br>*See* Select Lease Purchase Agreement, Article 1, Section 3. |
| **Closing** | Closing will take place no later than seven (7) days after the Sale Termination Date. |
| **Bidding Protections** | Expense reimbursement up to $35,000 (the "Expense Reimbursement Fee").<br><br>*See* Select Lease Purchase Agreement, Article 9, Section 3. |

C.    **Summary of the Bidding Procedures**

14.    The significant terms of the Bidding Procedures, which are applicable to

both Stalking Horse Agreements, are set forth below.  At the Auction, the Debtor will first seek a

potential buyer for all of the company's assets as a going concern or via a global offer to

purchase all assets (i.e., inventory, FF&E and leases in bulk).  The Debtor will then seek higher

and better bids to compete with the Agency Agreement.  Finally, the Debtor will seek bids on the

Debtor's leases, in bulk or separately, to compete with the Select Lease Purchase Agreement.

Thereafter, the Debtor will determine which bids or combination of bids generate the greatest

recovery and proceed accordingly.

| Provision | Description of Provision |
|---|---|
| **Delivery of Financial Information and Confidentiality of Debtor Information** | Competing bidders that wish to participate in the bidding process (a "Potential Bidder") must deliver the following:<br><br>(a)  a written disclosure of the identity of each entity, including involvement in any joint venture, that will be bidding (or participating in a bid) on the Assets or certain Asset Classes;<br><br>(b)  adequate assurance information, including (a) adequate information (in the Debtor's reasonable business judgment) about the financial condition of the Potential Bidder, such as federal tax returns for the previous two years, a current financial statement, and/or current bank account statements; and (ii) information demonstrating (in the Debtor's reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed transaction;<br><br>(c)  an executed confidentiality agreement in form and substance satisfactory to the Debtor; and<br><br>(d)  a *bona fide* non-binding letter of intent. |
| **Qualified Bids Deadline** | Bidders must submit their bid by 4:00 p.m. prevailing Eastern time two business days prior to the Auction.  The Debtor will notify all Qualified Bidders by not later than one business day after the Bid Deadline as to whether or not any bids constitute Qualified Bids with respect to any Asset Class and whether such Qualified Bidder's bid constitutes a Qualified Bid.  The Debtor may extend the Bid Deadline at its discretion. |
| **Qualified Bids Form** | Qualified Bids must include a duly authorized and executed copy of the Agency Agreement, Alternative Transaction Agreement, or Select Lease Purchase Agreement, as |

| Provision | Description of Provision |
|---|---|
| | applicable (including all exhibits and schedules thereto), together with copies marked to show any amendments and modifications thereto. |
| **Good Faith Deposit** | Qualified Bids must be accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtor), certified check or such other form acceptable to the Debtor, in an amount equal to ten percent of the value of such Qualified Bidder's Qualified Bid (as quantified by the Debtor |
| | A Successful Bidder that breaches any of its obligations under the applicable Successful Bidder Agreement shall forfeit its Deposit, which shall become property of the Debtor's estate without any further order of the Bankruptcy Court. The forfeiture of the Deposit shall be in addition to any other rights, claims and remedies that the Debtor and its estate may have against such Successful Bidder. |
| **Qualified Bids and Qualified Bidders** | A bid will be considered a qualified bid only if the bid is submitted by a Qualified Bidder and complies with all of the following in the Debtor's reasonable discretion: |
| | (a) states with specificity the Asset Classes such Qualified Bidder offers to purchase, in cash; |
| | (b) disclose any connection or agreements with the Debtor, SB Capital, Madrag, any other known Potential Bidder and/or any officer, director or equity security holder of Joyce Leslie, Inc.; |
| | (c) includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder; *provided that* if such Qualified Bidder is selected as the Successful Bidder or Back-Up Bidder, its offer will remain irrevocable until the conclusion of the Sale Hearing; |
| | (d) contains written confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement, including, but not limited to, any additional due diligence, inventory evaluation or financing conditions, and that all necessary approvals have been obtained prior to the date of submission of the |

| Provision | Description of Provision |
|---|---|
| | bid; |
| | (e) includes evidence, in form and substance reasonably satisfactory to the Debtor, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Alternative Transaction Agreement; |
| | (f) includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the Sale, that will allow the Debtor to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the Sale; |
| | (g) includes an acknowledgement and representation that the Qualified Bidder:  (a) has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets; (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, regarding the Assets or the completeness of any information provided except as expressly stated in the Alternative Transaction Agreement; and (d) is not entitled to any expense reimbursement, break-up fee or similar type of payment in connection with its bid; |
| | (h) is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtor), certified check or such other form acceptable to the Debtor, in an amount equal to ten percent of the value of such Qualified Bidder's Qualified Bid (as quantified by the Debtor) (the "Deposit"); |
| | (i) contains such other information as is requested by the Debtor in its business judgment; and |
| | (j) is received prior to the Bid Deadline. |
| **Bids on Individual Leases** | To be considered at the Auction so long as they exceed |

| Provision | Description of Provision |
|---|---|
| | Madrag's minimum bid of $720,000 for the aggregate designated leases, plus the funding of pre-petition rent cure amounts. |
| **No Shop or No Solicitation** | Neither the Agency Agreement, Select Lease Purchase Agreement nor the Bidding Procedures limit the Debtor's ability to solicit higher or otherwise better bids. |
| **Break Up Fee and Expense Reimbursement** | If the Court approves a Successful Bidder, other than SB Capital or Madrags, to ultimately consummate the transaction, SB Capital or Madrags will be entitled to a Break-Up Fee and Signage Costs Obligations, as applicable. |
| **Bidding Increments** | For the Asset Classes of Merchandise and Owned FF&E, to the extent that there is more than one Qualified Bid for such Asset Class, all initial overbids beyond SB Capital bid (i) must exceed SB Capital bid by an amount at least equal to one percent (1%) of the Cost Value (as defined in the Agency Agreement) of the Merchandise (as determined by Debtor in its reasonable discretion) plus cash in the amount of the Bid Protections (as defined in the Agency Agreement) (as quantified by the Debtor) (the "Minimum Overbid," projected to be at least $105,000) and (ii) agree to payment of the Signage Costs Reimbursement (as defined in the Agency Agreement) (either through direct reimbursement to SB Capital and/or assumption of obligation and payment to the vendor(s)). Bidding at the Auction will continue in increments of at least 0.10% (each successive bid, an "Inventory Overbid").  An Inventory Overbid shall remain open and binding on the Qualified Bidder(s) in accordance with its terms until and unless the Debtor accepts an alternate Qualified Bid as the Highest or Best Asset Bid for the Asset Class (or for a group of Asset Classes containing the Asset Class). During the course of the Auction, the Debtor shall, after submission of each Inventory Overbid, promptly inform each participant which Inventory Overbid reflects, in the Debtor's view, the highest or otherwise best offer. For each Asset Class other than inventory and Owned FF&E, to the extent that there is more than one Qualified Bid for a particular Asset Class, the Auction shall commence with bidding on such Asset Class at the amount equal to the Highest or Best Asset Class Bid applicable to such Asset Class.  Bidding on such Asset Class will |

| Provision | Description of Provision |
|---|---|
| | continue in increments of at least $100,000, or such other amount as determined by the Debtor in its business judgment (each successive bid, an "Asset Class Overbid").

An Asset Class Overbid shall remain open and binding on the Qualified Bidder(s) until and unless the Debtor accepts an alternate Qualified Bid as the Highest or Best Asset Class Bid on such Asset Class. During the course of the Auction, the Debtor shall, after submission of each Asset Class Overbid, promptly inform each participant which Asset Class Overbid reflects, in the Debtor's view, the highest or otherwise best offer for such Asset Class. When bidding on individual Asset Classes for which more than one Qualified Bid was received concludes, the Debtor, after consultation with the Committee and the Secured Lenders, shall determine a highest or otherwise best bid with respect to each Asset Class (each highest or best bid after conclusion of the auction, the "Winning Asset Class Bid").  To the extent a particular Asset Class did not receive more than one Qualified Bid (and accordingly, was not subject to the auction procedures set forth above in this paragraph), the Highest or Best Asset Class Bid shall be deemed to be the Winning Asset Class Bid for such Asset Class, subject to the provisions of these Bidding Procedures. In all events, the Debtor shall not be required to accept any bids made with respect to Assets in those Asset Classes that are not subject to the Agency Agreement (i.e. Asset Classes other than Merchandise and Owned FF&E).

If there is a Highest or Best Asset Bid, after determination of each Winning Asset Class Bid, the Debtor shall hold an auction for the Assets.  If the Winning Asset Class Bids, in the aggregate, or a Qualified Bidder for the Assets, are selected as the Highest or Best Asset Bid, then bidding will start at the aggregate consideration for the Winning Asset Class Bids or such Qualified Bidder's bid, plus 0.10%. Bidding at the Auction will continue in increments of at least 0.10% (each successive bid, an "All Assets Overbid").  A bidder seeing to purchase the Assets subject to the Agency Agreement as part of an All Assets Overbid must agree to the payment of the Signage Costs Reimbursement (either through direct reimbursement to SB Capital and/or assumption of obligation and payment to the vendor(s)).  An All Assets Overbid shall remain open and |

| Provision | Description of Provision |
|---|---|
| | binding on the Qualified Bidder(s) until and unless the Debtor accepts an alternate Qualified Bid(s) as the Highest or Best Asset Bid.  During the course of the Auction, the Debtor shall, after submission of each All Assets Overbid, promptly inform each participant, which All Assets Overbid reflects, in the Debtor's view, the highest or otherwise best offer.  For the avoidance of doubt, Asset Class bidders may make joint All Assets Overbids.

For the leases, to the extent that there is more than one Qualified Bid for such leases, all initial overbids beyond Madrag's bid must exceed Madrag's bid by at least $100,000, with bidding to continue in increments of at least $100,000 (each a "Lease Overbid").  The Debtor will entertain offers for a group of leases or individual leases in addition to the designated leases.  A Lease Overbid shall remain open and binding on the Qualified Bidder(s) in accordance with its terms until and unless the Debtor accepts an alternate Qualified Bid as the Highest or Best Asset Bid for the Assigned Leases. During the course of the Auction, the Debtor shall, after submission of each Lease Overbid, promptly inform each participant which Lease Overbid reflects, in the Debtor's view, the highest or otherwise best offer. |
| **Break Up Fee and Expense Reimbursement at Auction** | SB Capital and Madrag will not receive a "credit" equal to the Break Up Fee at the Auction. |
| **Modification of Bidding Procedures** | The Bid Deadline may be extended by the Debtor in consultation with SB Capital, Madrag and each of the Notice Parties. |
| **Closing with Alternative Backup Bidders** | If an Auction is conducted, the Qualified Bidder(s) with the second highest or otherwise best Qualified Bid at the Auction for the Assets or for any Asset Class, as determined by the Debtor in the exercise of its business judgment, and upon consultation with the Secured Parties, will be required to serve as a back-up bidder (a "**Back-Up Bidder**") and keep such bid open and irrevocable until the date that is three business days after the commencement of the Store Closing Sales or, if a going-concern bid is the Successful |

17

| Provision | Description of Provision |
|---|---|
| | Bid, until the closing of the Sale; provided that SB Capital and Madrag shall be required to serve as Back-Up Bidder only subject to the terms and conditions set forth in its bid (including, without limitation, any outside dates, milestones or termination events).  Following the Sale Hearing, if the Successful Bidder fails to consummate the Sale because of a breach or failure to perform on the part of such Successful Bidder, the applicable Back-Up Bidder will be deemed to be the new Successful Bidder for the Assets or applicable Asset Class, and the Debtor will be authorized but not required, to consummate the Sale with such Back-Up Bidder without further order of the Bankruptcy Court.  The Back-Up Bidder shall be required to close within three (3) business days following receipt of notice from the Debtor *provided, however*, that in the event SB Capital or Madrag is the Back-Up Bidder, SB Capital or Madrag shall be required to close only if such closing occurs prior to March 31, 2016 or May 14, 2016 respectively. |

15.     The Debtor believes that conducting the Auction is critical to the integrity of its search process for the highest and/or best bid.  Accordingly, within one business day of entry of the Bidding Procedures Order, the Debtor will serve a notice (the "Auction Notice"), attached as Exhibit 2 to the Bidding Procedures Order, by e-mail and/or first class mail upon:  (a) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (b) all the Debtor's landlords; (c) all applicable federal, state, and local taxing authorities; (d) all applicable state attorneys general; (e) all other government agencies required to receive notice under the Bankruptcy Rules; (f) the 20 largest unsecured creditors of the Debtor; (g) any other party that files a notice of opposition in the case; (h) any parties known by the Debtor to be potentially interested in participating in the proposed auction; and (i) any other party appearing on the Debtor's creditor matrix.

16.      In order to maximize notice, the Debtor is providing notice of this Motion to (a) the Office of the United States Trustee; (b) the Debtor's twenty (20) largest unsecured creditors; (c) counsel to SB Capital; (d) counsel to Madrag; (e) all the Debtor's landlords; (e) all applicable state attorneys general; (f) any potentially interested parties; and (g) parties entitled to notice pursuant to Bankruptcy Rule 2002.

17.      Any bidder that desires to make a bid will deliver written copies of its bid to (a) proposed counsel to the Debtor,  Goldberg Weprin, Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, New York 10036, Attn: Kevin J. Nash; (b) counsel to SB Capital, DiConza Traurig Kadish LLP, 630 Third Avenue, 7th Floor, New York, New York 10017, Attn: Maura Russell; (c) counsel to Madrag, Rosen & Associates, 747 Third Avenue, New York, New York 10017, Attn: Nancy Kourland;  and (d) counsel to the Official Committee of Unsecured Creditors, so as to be received not later than 4:00 p.m. on February 1, 2016 (the "Bid Deadline").

18.      Any objections to the Motion should be in writing, state the basis of such objection with specificity, be filed with the Court in compliance with the Bankruptcy Rules and the Local Rules and served upon the following (the "Bid and Objection Notice Parties"): (c) the proposed counsel to the Debtor,  Goldberg Weprin, Finkel Goldstein LLP, 1501 Broadway, 22nd Floor, New York, New York 10036, Attn: Kevin J. Nash; (b) counsel for any committee appointed in this chapter 11 case; (c) the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn: Susan Golden; (d) counsel to SB Capital, DiConza Traurig Kadish LLP, 630 Third Avenue, 7th Floor, New York, New York 10017, Attn: Maura Russell; and (g) counsel to Madrag, Rosen & Associates, 747 Third Avenue, New York, New York 10017, Attn: Nancy Kourland.

## Legal Basis For Relief Requested

**A.    Authorizing Entry into Stalking Horse Agreements, Bidding Protections and Bidding Procedures and Auction**

19.    Section 363(b)(l) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b)(l); *see also* Fed. R. Bankr. P. 6004(f)(1) (authorizing sales outside of the ordinary course of business to be conducted privately or by public auction).  A debtor-in-possession is given these rights by section 1107(a) of the Bankruptcy Code.

20.    Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, it is well settled that a sale of a debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business judgment exists for such a sale.  *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983), considering the following factors:

- Sound business reason for the sale;
- Accurate and reasonable notice;
- Proportionate value of the asset to the estate as a whole (fair and reasonable);
- The amount of elapsed time since the filing;
- The likelihood that a plan of reorganization will be proposed and confirmed in the near future;
- The effect of the proposed disposition on the future plan;
- The amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and
- Whether the asset is decreasing or increasing in value.

*Lionel*, 722 F.2d at 1071.

21.    Courts have made clear that a debtor's showing of a sound business justification does not have to be unduly exhaustive.  Rather, a debtor is "simply required to

20

justify the proposed disposition with sound business reason . . . ." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Moreover, the paramount goal in any proposed sale of property of the estate is to maximize the value received by the estate. *See* I̲n *re Food Barn Stores, Inc.*, 107 F.3d at 564-65 (8th Cir. 1997)(stating that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992)("It is a well-established principle of bankruptcy law that the. . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (*quoting* I̲n *re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

22.    Liquidation sales are a routine part of retail chapter 11 cases.  *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 136 B.R. at 359 (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring Debtor to maximize estate assets"). Bankruptcy courts in this and other districts have approved similar liquidation sales.  *See, e.g.*, *In re Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. July 21, 2011) (authorizing debtors' entry into agency agreement to conduct full-scale liquidation of stores); *In re Borders Grp., Inc.*, No. 11-10614 (MG) (Bankr. S.D.N.Y. Feb. 18, 2011) (authorizing debtors' entry into agency agreement to conduct store closing sales on first day); *In re G&G Retail, Inc.*, No. 06-10152 (RDD) (Bankr. S.D.N.Y. Feb. 17, 2006) (same).

## 1.    *The Bidding Protections Requested Are Reasonable and Justified*

23.    If SB Capital or Madrag are not the Successful Bidders, the Debtor proposes to provide each of them with certain Bidding Protections as outlined above.  The Bidding Protections are in consideration for SB Capital and Madrag conducting its due diligence, entering into the Agency Agreement and Select Lease Purchase Agreement, and agreeing to

subject their respective bids to the Auction.  The Bidding Protections were negotiated at arm's-length and in good faith, are reasonable, and are necessary to secure the respective stalking horse's participation in the Debtor's sale process.    The Bidding Protections should be approved and accorded administrative expense status under sections 503(b)(1)(A) and 507 of the Bankruptcy Code because they provide a clear benefit to the Debtor's estate and both SB Capital and Madrag expressly conditioned their willingness to enter into the Stalking Horse Agreements upon the Debtor's agreement to, and Court approval of, the Bidding Protections.

        2.        ***Entry into the Stalking Horse Agreements Is a Sound Exercise of the Debtor's Business Judgment***

      24.      Entry into the Stalking Horse Agreements is a sound exercise of the Debtor's business judgment. Utilizing a professional liquidating agent with substantial experience and expertise in conducting orderly simultaneous Store Closing Sales will maximize proceeds for the Debtor's estate in the event no higher and/or better Alternative Transaction is consummated.  Additionally, it is more cost effective for the Debtor to allow SB Capital or another liquidator that becomes a Successful Bidder to conduct the Store Closing Sales than for the Debtor to conduct such sales on its own because the Debtor is not responsible for the operating expenses of the liquidator.

      25.      Likewise, once the stores are emptied of inventory, it is more economical to attempt to obtain assignees for the leases, rather than expose the estate to pre-petition rent arrears or substantial rejection claims which will eat away at recovery for the trade creditors.

      26.      The Debtor has and will demonstrate that the Stalking Horse Agreements are the result of good faith arms'-length negotiations.  Additionally, certain financial accommodations provided by the Stalking Horse Agreements constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code.

27.     Moreover, the Debtor submits that the consideration provided pursuant to the Stalking Horse Agreements is fair and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and other applicable Federal and State laws.

### 3.     Bidding Procedures

28.     The Debtor believes that the solicitation of bids to serve as the Debtor's agent in connection with the Store Closing Sales or to serve as a going-concern buyer, or to buy some or all of the store leases, is the best way to maximize the value of the Debtor's estate. Accordingly, the Debtor respectfully requests that the Court approve the proposed Bidding Procedures.

29.     The Debtor submits that the form of Auction Notice, substantially in the form attached as an exhibit to the Bidding Procedures Order, is reasonably calculated to provide timely and adequate notice of the proposed Store Closing Sales, the Bidding Procedures, the Auction and the Sale Hearing to the Debtor's creditors and all other parties-in-interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets on a going concern or liquidation basis.

## D.     The Store Closing Sales

### 1.     Approval of Store Closing Sales Under Section 363 of the Bankruptcy Code is Warranted

30.     The Debtor, exercising its business judgment has determined that, in the event there is no viable higher and/or better Alternative Transaction with a going concern buyer, it is in the best interests of the Debtor and its creditors to conduct Store Closing Sales as quickly as possible.  In fact, delays in the liquidation process would result in added expense and could cause portions of the Debtor's inventory to become less valuable.

23

31.     Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). *See In re Ames Dept. Stores., Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by section 363(b)). To obtain court approval to use property under section 363(b) of the Bankruptcy Code for the purpose of a liquidation sale at auction, the Debtor need only show a legitimate business justification for the proposed action. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

32.     If a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Accordingly, parties challenging a debtor's decision must make a showing of "bad faith, self-interest or gross negligence." *Integrated Resources*, 147 B.R. at 656 (citations omitted).

33.     Courts examine four factors in determining whether a sound business purpose or justification exists for a sale of assets under section 363(b) of the Bankruptcy Code: (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration will be provided; (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate and reasonable notice has been provided. *See Lionel*, 722 F2d at 1071.

24

34.     The Debtor and its advisors have analyzed the Debtor's business and various strategic alternatives and determined that an immediate liquidation of the Debtor's retail locations and a sale of the leases is the only realistic alternative to maximize recoveries for the creditors in the event a going concern buyer is not identified at or prior to the Auction.

35.     Perhaps equally important is pursuit of immediate Store Closing Sales to reduce the accrued administrative expenses since SB Capital or another Successful Bidder is assuming a significant portion of the risks and costs of the Store Closing Sales and will pay expenses as of February 5, 2016.

36.     Moreover, since the Debtor has no secured creditors, the ability to proceed with Store Closing Sales is made easier and the provisions of Section 363(f) of the Bankruptcy Code are not implicated.

## 2.     *Restrictive Provisions Impeding Store Closing Sales are Unenforceable*

37.     The Debtor leases all of its retail store locations and thus, the Store Closing Sales may be inconsistent with certain provisions of the governing leases or other documents to which the Debtor is a party, whether or not filed of record, with respect to any of the leased retail store locations, including, for example, reciprocal easements, "go dark" provisions, landlord recapture rights, and other covenants that purport to restrict or prohibit the Debtor from conducting store closing or similar themed sales.  Such restrictive provisions are unenforceable in bankruptcy as they constitute an impermissible restraint on a debtor's ability to effectively administer its estate and maximize the value of its assets under the Bankruptcy Code. *See In re Ames Dep't Stores*, 136 B.R. at 359 (holding that enforcement of lease restrictions would "contravene overriding federal policy requiring Debtor to maximize estate assets"); *In re R.H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (finding that landlord

could not recover for breach of covenant to stay open because debtor had a duty to maximize value to the estate by conducting a store closing sale and closing the store).

38.     Similarly, to the extent there are restrictive provisions in any of the governing leases dictating the manner, method, dimensions relating to or otherwise prohibiting the use of advertising materials or signage to be used relating to the conduct of the Store Closing Sales, the Debtor requests that such restrictive provisions be invalidated as improper interference with the Debtor's ability to effectively conduct the Store Closing Sales and maximize the liquidation value of the Assets.  Courts in this District have routinely granted similar relief and held that restrictive lease provisions affecting store closing sales in chapter 11 cases are unenforceable.  *See, e.g.*, *In re Great Atl. & Pac. Tea Co.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015); *In re dELiA*s, Inc.*, No. 14-23678 (RDD) (Bankr. S.D.N.Y. Jan. 28, 2015).

39.     Accordingly, to the extent that any provisions or restrictions exist in any of the leases governing the retail store locations or other documents, the Debtor respectfully requests that the Court override such provisions and authorize the Debtor and/or the Successful Bidder to conduct the Store Closing Sales in accordance with the Sale Guidelines without interference by any landlords or other persons affected in any way, directly or indirectly, by the Store Closing Sales.

3.     ***Store Closing Sales Should be Exempt from Federal, State, and Local Laws, Statutes, Rules and Ordinances Relating to Liquidations***

40.     The Debtor operates retail locations across four states (New York, New Jersey, Pennsylvania and Connecticut) that may have state and local laws, statutes, regulations, rules and ordinances governing store closing, liquidation, or similar themed sales, that require waiting periods, special licenses and permits, or restrictions against bulk sales and augmentation

(collectively, the "Liquidation Laws").  The Bankruptcy Code preempts state and local laws that

conflict with its underlying policies, and the Court has the authority, under section 105(a) of the

Bankruptcy Code, to permit the Store Closing Sales notwithstanding contrary Liquidation Laws.

*See generally Belculfine v. Aloe (In re Shenango Grp., Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa.

1995) (noting that debtors have unique fiduciary and legal obligations pursuant to the

Bankruptcy Code and that state statutes "cannot place burdens on them where the result would

contradict the priorities established by the federal bankruptcy code.").

      41.      Here, the Debtor's ability to use and sell the Merchandise pursuant to

section 363 of the Bankruptcy Code, in order to maximize recovery for their estate and creditors,

would be severely undermined if the Court does not provide for a waiver of the Liquidation

Laws.  Courts in this and other Districts have routinely granted comparable relief. *See, e.g.*, *In re*

*Great Atl. & Pac. Tea Co.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015); *In re*

*dELiA*s, Inc.*, No. 14-23678 (RDD) (Bankr. S.D.N.Y. Jan. 28, 2015).

      42.      Requiring the Debtor to comply with each state's applicable local

Liquidation Laws would be extremely burdensome and adjudication of disputes with local

authorities over the application and interpretation of local laws would be tremendously expensive

for the estate.  Moreover, in the context of a bankruptcy proceeding, waiving compliance with

Liquidations Laws is entirely appropriate as the Debtor and its Assets are subject to the Court's

exclusive jurisdiction and the Court would be able to supervise and ensure proper conduct of the

Store Closing Sales.  Additionally, governmental units and parties-in-interest will receive notice

of this Motion and the opportunity to be heard on any objections.  Thus, the Debtor respectfully

requests that the Court expressly approve the Sale Guidelines and authorize the Debtor and/or the

Successful Bidder to conduct the Store Closing Sales without the added costs and delay of complying with applicable local Liquidation Laws.

43.    The requested waiver is narrowly tailored to facilitate the successful conduct of the Sale.  The Debtor is not seeking a general waiver of all state and local laws, but only those specifically governing liquidation or similarly themed sales.  The Debtor fully intends to comply with applicable state and local environmental, tax, employment, public health and safety laws, and consumer protection laws (regulating deceptive practices), except as explicitly set forth in this Motion.

## E.    Other Related Relief

### 1.    The Debtor Should be Authorized to Abandon Certain Property Following the Conclusion of the Store Closing Sales

44.    After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (stating that a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

45.    Pursuant to the Agency Agreement, the Successful Bidder is authorized to sell Owned FF&E remaining in the retail store locations following the conclusion of the Store Closing Sales.  However, the Debtor (or the Successful Bidder) may determine that the costs associated with holding and/or selling certain property and/or Owned FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of inconsequential value and benefit to the estate and/or may be burdensome to retain.

28

46.     To maximize the value of the Debtor's Assets and to minimize the costs to the estate, the Debtor respectfully requests authority to abandon any of remaining Owned FF&E or other property located at the retail store locations without incurring liability to any person or entity.  The Debtor further requests that the landlords of each retail store location with any abandoned Owned FF&E or other property be authorized to dispose of such property without liability to any third parties.

**2.     *Sale of the Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman***

47.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or release personally identifiable information about individuals unless such sale or lease is consistent with its policies as of the date of the commencement of the case, or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.

48.     Pursuant to the Agency Agreement, the Successful Bidder will be permitted only to use the Debtor's customer lists when acting as the Debtor's agent and in connection with the Sale.  The Successful Bidder will be subject to reasonable restrictions by the Debtor in order to comply with the Debtor's privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data.  While the Debtor may sell or lease any personally identifiable information to the Successful Bidder, such transfer would be consistent with the Debtor's policies as of the Petition Date.  Therefore, appointment of a consumer privacy ombudsman is unwarranted.

**Good Faith Under Section 363(m) of the Bankruptcy Code;**
**Sale Not In Violation of Section 363(n) of the Bankruptcy Code**

49.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of Property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such Property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m). Section 363(n) of the Bankruptcy Code, among other things, provides, in

turn, that a trustee may avoid a sale under such section if the sale price was controlled by an

agreement among potential bidders at the sale.

50.    The Stalking Horse Agreements were negotiated, arm's length

transactions, in which SB Capital and Madrag have acted in good faith, without collusion or

fraud. SB Capital and Madrag are not "insiders" or "affiliates" of the Debtor as those terms are

defined in the Bankruptcy Code. Neither SB Capital nor Madrag has engaged in any conduct

that would prevent the application of section 363(m) of the Bankruptcy Code or otherwise

implicate section 363(n) of the Bankruptcy Code. In addition, if a party other than SB Capital or

Madrag is the Successful Bidder, the Debtor intends to make an appropriate showing at the Sale

Hearing that the purchase agreement(s) with the other Successful Bidder(s) is a negotiated, arm's

length transaction, in which the Successful Bidder at all times has acted in good faith under and

otherwise in accordance with such standards.

**Authorization of Assumption and Assignment of Assumed Leases**

51.    As discussed above, the Stalking Horse Agreements contemplate a process

whereby the Debtor would solicit offers for the store leases. Thus, the Debtor requests

authorization to assume and assign the commercial leases designated by Madrag, or by another

Successful Bidder (the "Assumed Leases").

52.    If a lease is assumed and assigned pursuant to the Approval Order, then

unless the affected landlord properly files and serves an objection to the proposed Cure Costs,

the landlord will receive at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Costs.

53.    Madrag or another Successful Bidder(s), on behalf of the Debtor, shall promptly pay or cause to be paid the Cure Costs with respect to the Assumed Leases, other than those Cure Costs, if any, which are to be paid by the Debtor pursuant to the agreement with Madrag or another Successful Bidder(s).  Madrag or another Successful Bidder(s) shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Leases.  The Debtor requests that Cure Costs disputed by any landlord be resolved by the Court at the Sale Hearing or at such other hearing to approve assumption and assignment of the relevant lease.

54.    Except to the extent otherwise provided in the agreement(s) entered into with Madrag or another Successful Leases(s), subject to the payment of any Cure Costs, the assignee of any Assumed Leases will not be subject to any liability to the landlord that accrued or arose before the closing date of the sale of the Assets and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

55.    The Debtor further requests that the Sale Order provide that the Assumed Leases will be assigned to, and remain in full force and effect without default for the benefit of Madrag, or another Successful Bidder(s).

56.    Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision.  *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St.*

31

*Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953).  Accordingly, assumption or rejection of

an executory contract is appropriate where the assumption or rejection would benefit the estate.

The assumption and assignment of the Assumed Leases will benefit the Debtor's estate for the

reasons set forth above.

   57. As set forth above with respect to Assumed Leases to be assumed and

assigned pursuant to the Sale, the Debtor will have sent a cure notice (the "Cure Notice") to all

landlords at least 1 day prior to the Auction, notifying such landlords of the intended assumption

by the Debtor and assignment to Madrag or another Successful Bidder(s).

   58. The landlords will have sufficient opportunity to file an objection to the

proposed cure costs (the "Cure Costs") set forth on the Cure Notice.  To the extent no objection

is filed with regard to a particular cure amount, such cure amount shall be binding on the

applicable landlord.  The payment of the Cure Costs set forth in the Cure Notice (or a different

amount either agreed to by the Debtor or resolved by the Court as a result of a timely-filed

objection filed by a landlord) will be in full and final satisfaction of all obligations to cure

defaults and compensate the landlords for any pecuniary losses under such leases pursuant to

section 365(b)(1) of the Bankruptcy Code.

   59. Madrag or another Successful Bidder(s) is responsible for providing

evidence of "adequate assurance of future performance" to the extent required in connection with

the assumption and assignment of any Assumed Leases.  The meaning of "adequate assurance of

future performance" for the purpose of the assumption of executory contracts and unexpired

leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of

each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v.*

*Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also, e.g., In re*

*Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future

performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon*

*Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).

### Further Relief

60.     The Debtor requests that the Court waive the stay imposed by Bankruptcy

Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other

than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise." Time is of the essence and it is imperative that the Debtor be able to

assume the Agency Agreement or, in the alternative, enter into the Alternative Transaction

Agreement, and commence the Store Closing Sales on the timeline proposed.  In order to

maximize the value of the Assets and minimize the estate' unnecessary administrative expenses,

the Debtor believes a waiver of the 14-day stay imposed by Bankruptcy Rules 4001(a), 6004(h)

and 6006(d), to the extent that they apply, is in the best interest of the Debtor's estate and

stakeholders.

### Notice

61.     Notice of this Motion has or will be provided to:  (a) the Office of the

United States Trustee; (b) the Debtor's twenty (20) largest unsecured creditors; (c) counsel to SB

Capital; (d) counsel to Madrag; (e) all the Debtor's landlords; (e) all applicable state attorneys

general; (f) any potentially interested parties and (g) parties entitled to notice pursuant to

Bankruptcy Rule 2002.

### No Prior Request

62.     No prior motion for the relief requested herein has been made to this or

any other Court.

**WHEREFORE**, the Debtor respectfully requests that the Court grant relief

consistent with the foregoing; and grant such other and further relief as the Court deems

appropriate.

Dated:   New York, New York
         January 14, 2016

                               Respectfully submitted,

                               /s/ Kevin J. Nash
                               Kevin J. Nash
                               Evan M. Lazerowitz
                               Goldberg Weprin Finkel Goldstein LLP
                               Proposed Counsel for the Debtor
                               1501 Broadway – 22nd Floor
                               New York, New York 10036
                               Telephone: (212) 221-5700
                               KNash@gwfglaw.com

x:\gwfg\new data\yen\word\joyce leslie\second day motions\motion to employ liquidation agent 1-14-16 - v2.docx