# EXHIBIT A

# AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is entered into as of this 2nd day of February, 2016, by and between and JOYCE LESLIE Inc., a Delaware Corporation, with a principal place of business at 170 W Commercial Avenue, Moonachie, NJ 07074 (the "Merchant") and a joint venture among GORDON BROTHERS RETAIL PARTNERS, LLC (the "Agent", and collectively with Merchant, the "Parties").

# RECITALS

WHEREAS, Merchant operates certain retail store locations and desires that Agent act as Merchant's exclusive agent for the limited purpose of (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's  retail store location(s) identified on Exhibit A-1 attached hereto, (each a "Store", and collectively, the "Stores") through the Stores, and (b) selling all of the Owned FF&E (as hereinafter defined) located in the Stores and Merchant's corporate offices (collectively, the "Closing Locations"), by means of a "going out of business," "store closing", "sale on everything", "everything must go", or similarly themed sale (in each case as further described below, the "Sale"); and

WHEREAS,  Merchant has filed a voluntary petition on January 9, 2016 for relief under chapter 11 of Title 11,  United States Code (the "Bankruptcy Code"), initiating a chapter 11 case (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Definitions and Exhibits

1.1    Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Additional Agent Merchandise | Section 8.9 |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(c)(ii) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent's Fee | Section 3.1(b) |
| Agent's FF&E Commission | Section 15(a) |
| Agent Claim | Section 12.5 |
| Agent Collateral | Section 16.11(a) |
| Agent Indemnified Parties | Section 8.3(a) |

| | |
|---|---|
| Agreement | Preamble |
| Applicable General Laws | Section 2(c) |
| Approval Order | Section 2(b) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1(c) |
| Central Services | Section 4.1 |
| Competing Bid | Section 16.12(a) |
| Cost File | Section 5.3(a) |
| Cost Value | Section 5.3(a) |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Section 3.3(c)(i) |
| Distribution Center | Section 5.5 |
| Distribution Center Expenses | Section 4.1 |
| Distribution Center Services | Section 5.5 |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| Excluded Defective Merchandise | Section 5.2(b) |
| Excluded Pricing Adjustments | Section 3.1(c)(ii) |
| Existing Vendors | Section 8.9(a) |
| Expenses | Section 4.1 |
| Excluded Store FF&E | Section 15(a) |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 8.7(b)(i) |
| Final Reconciliation Settlement Date | Section 8.7(b)(i) |
| Force Majeure Event | Section 8.8 |
| FF&E Commission Option | Section 15(a) |
| FF&E Disposition Budget | Section 15(a) |
| FF&E Disposition Expenses | Section 15(a) |
| FF&E Guaranty Amount | Section 15(a) |
| FF&E Guaranty Option | Section 15(a) |
| FF&E Sale Election Deadline | Section 15(a) |
| FF&E Sale Option | Section 15(a) |
| Gross Rings | Section 5.3(b)(vi) |
| Gross Rings Period | Section 5.3(b)(vi) |
| Guaranteed Amount | Section 3.1(a) |
| Guaranty Percentage | Section 3.1(a) |
| Hazardous Materials | Section 15(d) |
| Initial Guaranty Payment | Section 3.3(a) |
| Inventory Date | Section 5.1(a) |
| Inventory Reconciliation Date | Section 3.3(a) |
| Inventory Taking | Section 5.1(a) |
| Inventory Taking Instructions | Section 5.1(a) |
| Inventory Taking Service | Section 5.1(a) |
| Lease Extension Motion | Section 10.1(d) |

| | |
|---|---|
| Letter of Credit | Section 3.1(h) |
| Liquidation Sale Laws | Section 2(c) |
| Lowest Location Price | Section 3.1(e)(i) |
| Membership Program Discount | Section 8.6(b) |
| Merchandise | Section 5.2(a) |
| Merchandise Ceiling | Section 3.1(d) |
| Merchandise Receipt Deadline | Section 5.2(a) |
| Merchandise Threshold | Section 3.1(d) |
| Merchant | Preamble |
| Merchant's Designated Account | Section 3.3(a) |
| Merchant Indemnified Parties | Section 8.3(a) |
| Net FF&E Proceeds | Section 15(a) |
| Non-CAM Trash Removal Charges | Section 4.1 |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 15(a) |
| Parties | Preamble |
| Payment Date | Section 3.3(a) |
| POS | Section 3.1(e)(i) |
| Prevailing Discount Adjustment | Section 5.3(b)(iii) |
| Proceeds | Section 3.3(b) |
| Reconciled DC Merchandise Receipts | Section 5.1(b) |
| Remaining Merchandise | Section 3.2 |
| Retail Price | Section 5.3(b) |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3(a) |
| Sales Tax Account | Section 8.3(a) |
| Shipping Variance | Section 5.1(b) |
| Shipping Variance Response | Section 5.1(b) |
| Store(s) | Recitals |
| Third Party | Section 4.1 |
| Third Party Vendors | Section 8.9(a) |
| UCC | Section 8.9(c) |
| Vacate Date | Section 6.2 |
| WARN Act | Section 9.1 |

      1.2   <u>Exhibits</u>.  The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

      <u>Exhibit</u>          <u>Section Reference</u>   <u>Description</u>

| Exhibit A-1 | Recitals | Stores |
|---|---|---|
| Exhibit 3.1(c) | Section 3.1(c) | Merchandise Ceiling/Threshold Adjustment |
| Exhibit 3.1(d) | Section 3.1(d) | Cost Factor Adjustment |
| Exhibit 3.3(a) | Section 3.3(a) | Merchant's Designated Account |
| Exhibit 3.3(h) | Section 3.3(h) | Form of Letter of Credit |
| Exhibit 4.1(a) | Section 4.1(a) | Store Occupancy Expense Schedule |
| Exhibit 5.1(a) | Section 5.1 | Inventory Taking Instructions |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 10.1(c) | Section 10.1(c) | Form of Approval Order |
| Exhibit 11.1(d) | Section 11.1(d) | Pre-Existing Liens |
| Exhibit 11.1(k) | Section 11.1(k) | Planned Promotional Activity January |
| Exhibit 11.1 (l) | Section 11.1(l) | Pending Matters |
| Exhibit 11.1(q) | Section 11.1(q) | List of Store Leases that Expire During Sale |
| Exhibit 15 | Section 15 | Excluded Store FF&E Option Stores |

<u>Section 2.</u>    <u>Appointment of Agent/Liquidation Sale Laws/Approval Order</u>

(a)    <u>Appointment of Agent</u>.  Effective on the date hereof and subject to the entry of the Approval Order, Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of Merchant's Owned FF&E at the Closing Locations, in accordance with the terms and conditions of this Agreement.

(b)    <u>Approval Order</u>. On the date of the commencement of the Bankruptcy Case, Merchant has filed a motion with the Bankruptcy Court seeking (I) entry of Bid Procedures Order approving Bidding Procedures and all of the Bid Protections (each as further described in Section 16.10 hereof) and (II) entry of an order , <u>inter alia</u>, approving this Agreement and authorizing Merchant and Agent to conduct the Sale in accordance with the terms hereof (the "<u>Approval Order</u>").  The Approval Order shall be in substantially the form annexed hereto as <u>Exhibit 10.1(c)</u>, and otherwise be reasonably satisfactory to the Merchant and Agent, and provide, <u>inter alia</u>, that:

(i)    this Agreement (and the Sale and each of the other transactions contemplated hereby) is approved in its entirety;

(ii)    Merchant and Agent shall be authorized to take any and all actions as may be necessary or desirable to implement this Agreement and the Sale and each of the other transactions contemplated hereby;

(iii)    Agent shall be entitled to sell all Merchandise, the Additional Agent Merchandise, and Owned FF&E  hereunder free and clear of all liens, claims, interests or encumbrances thereon, with any such presently existing liens, claims, interests or encumbrances encumbering all or any portion of the Merchandise, Additional Agent Merchandise, Owned FF&E or the Proceeds or any other proceeds of the foregoing

attaching only to the Guaranteed Amount and other amounts to be received by Merchant under this Agreement;

(iv)   Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person subject to compliance with the Sale Guidelines and Approval Order;

(v)   Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale as a "going out of business," "store closing," "sale on everything," "everything must go," or similarly themed sale (including, without limitation, by means of media advertising, interior and exterior banners, A-frames, and similar signage and the use of sign walkers) without further consent of any person, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without compliance with the Liquidation Sale Laws, subject to compliance with the Sale Guidelines and Approval Order;

(vi)   Agent shall be granted a limited royalty free license and right to use until the Sale Termination Date the trademarks, trade names, logos, customer lists, website, URL, mailing lists and email lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of this Agreement;

(vii)   all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement;

(viii)  all utilities, Internet service providers, website service or hosting providers, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct or advertising of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or otherwise impedes the conduct or advertising of the Sale;

(ix)   the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement;

(x)   Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement;

(xi)   subject to the terms and provisions of this Agreement, Agent shall be authorized to include Additional Agent Merchandise in the Sale;

(xii)  subject to Agent having satisfied its obligations under this Agreement to tender payment of the Initial Guaranty Payment and to deliver the Letter of Credit, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of Bankruptcy Code senior to all other superpriority claims;

(xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16.11 hereof without the necessity of filing financing statements to perfect the security interests;

(xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted;

(xv)  Merchant's decisions to (A) enter into this Agreement and (B) perform under and make payments required by this Agreement is a reasonable exercise of Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest;

(xvi) this Agreement was negotiated in good faith and at arms' length between Merchant and Agent and that Agent is entitled to the protection of Section 363(m) of the Bankruptcy Code;

(xvii)Agent's performance under this Agreement will be, and payment of the Guaranteed Amount under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of Sections 363(m) and 364(e) of the Bankruptcy Code;

(xviii) this Agreement is approved pursuant to Section 363 of the Bankruptcy Code;

(xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Sections 363(m) and 364(e) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order;

(xx)  (A) the terms of this Agreement shall be binding on any trustee appointed for the Merchant under any provision of the Bankruptcy Code, whether the Bankruptcy Case of the Merchant is proceeding under chapter 7 or chapter 11 of the Bankruptcy Code (the "Trustee"); (B) any such Trustee shall be authorized  to operate the business of Merchant to the fullest extent necessary to permit compliance with the terms of this Agreement; and (C) Agent and any such Trustee shall be authorized to perform under this Agreement upon the appointment of a Trustee without the need for further order of the Bankruptcy Court;

(xxi) the application of any automatic stay of enforcement of the Approval Order is waived;

(xxii) the Approval Order constitutes an authorization of the conduct of Merchant and Agent in connection herewith;

(xxiii) through and including completion of the Final Reconciliation, Agent shall be entitled to be heard on all issues in the Bankruptcy Case related to this Agreement or the transactions contemplated thereby;

(xxiv) nothing contained in this Agreement and none of Agent's actions taken in respect of this Agreement or the transactions contemplated hereby shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees (except for Agent's obligations to pay Expenses), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees;

(xxv) in the event Merchant notifies Agent of its intention to draw on the Letter of Credit, Agent shall be entitled to an emergency hearing by the Bankruptcy Court sufficient to determine whether such draw is permitted under the terms of this Agreement prior to the occurrence of such draw; and

(xxvi) during the Sale Term applicable to any Store and for purposes of conducting the Sale at such Store, (A) Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, such Store and the assets currently located at such Store, in each case subject to the extent of Merchant's rights and entitlement to use the same, and the services provided at such Store to the extent Merchant is entitled to such services and (B) Merchant shall not assign, reject or otherwise terminate any lease relating to any such Store where such assignment, rejection, or termination would have an effective date on or prior to the applicable Sale Termination Date or Vacate Date for such Store.

(c)    Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "going out of business," "store closing", "sale on everything", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, permitting, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business," "store closing" "sale on everything", "everything must go" or similar-themed sales, including laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply to the Sale, but excluding those designed to protect public health and safety (collectively,

the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms
of this Agreement, the Sale Guidelines and the Approval Order.

(d)    Authority.  Except as otherwise specifically provided in this Agreement, Agent
shall have no authority, and shall not represent that it has any authority, to enter into any
contract, agreement, or other arrangement or take any other action by or on behalf of Merchant,
that would have the effect of creating any obligation or liability, present or contingent, on behalf
of or for the account of Merchant without Merchant's prior written consent.

Section 3.    Guaranteed Amount and Other Payments

3.1    Payments to Merchant and Agent.

(a)    As a guaranty of Agent's performance hereunder, in addition to the
payment of Expenses (as provided for in Section 4.1 hereof), Agent guarantees that Merchant
shall receive an amount (the "Guaranteed Amount") equal to sixty eight percent (68%) (the
"Guaranty Percentage") of the aggregate Cost Value of Merchandise. The Guaranteed Amount
will be calculated based upon the product of (x) the Guaranty Percentage *multiplied by* (y) the
aggregate Cost Value of the Merchandise (in the case of (y), as determined by (A) the Final
Inventory Report at the conclusion of the Inventory Taking by the Inventory Taking Service after
verification and reconciliation thereof by Merchant and Agent, (B) the aggregate amount of
Gross Rings (as adjusted for shrinkage per this Agreement), (C) the aggregate Cost Value of
Display Merchandise included in the Sale; and (E) the aggregate Cost Value of Returned
Merchandise included in the Sale and not otherwise included in the Inventory Taking. Agent
shall pay to Merchant (or its designee) the Guaranteed Amount in the manner and at the times
specified in Section 3.3 below.

(b)    To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount,
plus (y) Expenses of the Sale, plus (z) an amount equal to the sum of (i) six percent (6%) of the
sum of the aggregate Cost Value of the Merchandise included in the Sale; plus (ii) five percent
(5%) of the gross sale Proceeds from the sale of Additional Agent Merchandise (exclusive of
sale taxes) (the amount set forth in clause (z), the "Agent's Fee" and the sum of clauses (x), (y)
and (z) being collectively defined as "Agent Threshold"), then all remaining Proceeds of the
Sale above the Agent Threshold shall be paid to Agent.

(c)    The Guaranty Percentage has been fixed based upon the Merchant's
representation that the aggregate Cost Value (as defined in Section 5.3(a) of this Agreement) of
the Merchandise is not less than $3,000,000 (the "Merchandise Threshold") and not greater than
$3,500,000 (the "Merchandise Ceiling").  To the extent that the aggregate Cost Value of the
Merchandise included in the Sale is less than or greater than the Merchandise Threshold or
Merchandise Ceiling, as applicable, then such deviation shall not constitute a breach of any
representation or warranty, or an Event of Default; provided, however, that, the Guaranty
Percentage shall be adjusted in accordance with Exhibit 3.1(c) attached hereto.[1] Any adjustment

---

[1] Notwithstanding anything in this Agreement to the contrary, Exhibit 3.1(c) will be updated to reflect an initial
Guaranty Percentage of 68%.

to the Guaranty Percentage provided for under this Section 3.1(c) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, without limitation, any adjustment provided for under Sections 3.1(d) hereof.

(d)    The Guaranty Percentage has also been fixed based upon the assumption that the aggregate Cost Value of the Merchandise included in the Sale as a percentage of Retail Price (as defined in Section 5.3(b) of this Agreement) of the Merchandise included in the Sale (without taking into account any Shrink Provision, Prevailing Discount Adjustment and/or Excluded Price Adjustments) (the "Cost Factor") shall not be greater than forty-three and nine-tenths of one percent (43.90%) (the "Cost Factor Threshold").  In the event that the Cost Factor is greater than the Cost Factor Threshold, then such deviation shall not constitute a breach of any representation or warranty, or an Event of Default; provided, however, that, the Guaranty Percentage shall be adjusted (in addition to any applicable adjustment hereunder) in accordance with Exhibit 3.1(d).[2]  Any adjustment to the Guaranty Percentage provided for under this Section 3.1(d) shall be cumulative with, and in addition to, any other adjustment provided for under this Agreement, including, without limitation, any adjustment provided for under Sections 3.1(c) hereof. For purposes of this Agreement:

(e)    To ensure accurate sales audit functions, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores.

3.2    Payments to Agent.  Subject to Agent's obligation to pay in full the Guaranteed Amount and all Expenses, Agent shall be entitled to retain any remaining Proceeds (inclusive of the Agent's Fee).  Provided that no Event of Default has occurred and continues to exist on the part of Agent, all Merchandise and Additional Agent Merchandise remaining at the conclusion of the Sale ("Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims, interests and encumbrances of any kind or nature. Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo.

3.3    Time of Payments; Proceeds; Control of Proceeds

(a)    On the first (1st) business day after entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount (the "Initial Guaranty Payment") equal to seventy-five percent (75%) of the product of (i) the Guaranty Percentage *multiplied by* (ii) the sum of (x) estimated aggregate Cost Value of the Merchandise to be included in the Sale as reflected on Merchant's books and records at the close of business on the last business day immediately preceding the Sale Commencement Date; minus (y) an estimated shrink amount in an amount equal to (3.86%) of Merchant's aggregate cost of sales per the Merchant's stock ledger (not inclusive of financial accruals for shrink) in the Stores the twelve month period

---

[2] Notwithstanding anything in this Agreement to the contrary, Exhibit 3.1(d) will be updated to reflect an initial Guaranty Percentage of 68%.

immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount");
provided that, the Estimated Guaranteed Amount payable by Agent on the Payment Date shall be
calculated based on Merchandise located in the Stores as of the close of business on the last
business day immediately preceding the Sale Commencement Date.  On the Payment Date, the
Initial Guaranty Payment shall be made by wire transfer of immediately available funds to the
account designated on Exhibit 3.3(a) attached hereto (the "Merchant's Designated Account").
The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer of
immediately available funds to the Merchant's Designated Account on the second (2nd) business
day following the issuance of the final report of the aggregate Cost Value of the Merchandise
counted by the Inventory Taking Service following the completion of the Inventory Taking, after
review, reconciliation and mutual written verification thereof by Merchant and Agent (the "Final
Inventory Report"). In the event of a dispute as to the calculation of any portion of the
Guaranteed Amount, any such dispute shall be resolved in the manner and at the times set forth
in Section 8.7(b)(ii) hereof. Agent's failure to pay such balance (if there is no dispute as to any
portion of the Guaranteed Amount) shall entitle the Merchant to draw upon the Letter of Credit
in accordance with Section 3.3(i) hereof to the extent of such balance or undisputed portion, as
applicable.  Merchant and Agent shall exercise commercially reasonable efforts to reconcile the
Inventory Taking within twenty-one (21) days after its completion. In the event that the Initial
Guaranty Payment is either less than or exceeds the Guaranteed Amount, as applicable, Agent or
Merchant, as the case may be, shall pay to Merchant or Agent, as the case may be, the amount
(the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the
Initial Guaranty Payment.

(b)    For purposes of this Agreement, "Proceeds" shall mean the aggregate of
(i) the total amount (in dollars) of all sales of Merchandise made under this Agreement, and all
service revenue received by Merchant from the Stores, in each case during the Sale Term and
exclusive of Sales Taxes; (ii) the total amount (in dollars) of all sales of Additional Agent
Merchandise (exclusive of Sales Taxes); (iii) all proceeds of Merchant's insurance for loss or
damage to Merchandise arising from events occurring during the Sale Term relating to the
Merchandise and Additional Agent Merchandise; and (iv)) any and all proceeds received by
Agent from the disposition of Remaining Merchandise. For the avoidance of doubt: (1) proceeds
from the sales at the Stores for periods prior to the Sale Commencement Date; and (2) all
proceeds of Merchant's insurance for loss or damage to Merchandise arising from events
occurring prior to the Sale Commencement Date; (4)  proceeds from the sale or other disposition
of Owned FF&E (subject to Agent's right to receive Agent's FF&E Commission under Section
15 below) or the FF&E Guaranty Amount, as applicable; and (5) payments made by Agent on
account of the Guaranteed Amount,  Expenses, the Letter of Credit, shall, in each case, not
constitute "Proceeds" hereunder.

(c)    All Proceeds shall be controlled by Agent in the manner provided for
below:

(i)    From and after the Sale Commencement Date and prior to the date
Agent establishes the Agency Accounts (see clause (ii) below), all Proceeds (including credit
card Proceeds) and proceeds of the sale of Owned FF&E shall be collected by Merchant and
deposited on a daily basis into depository accounts designated by, owned and in the name of,
Merchant for the Stores, which accounts shall be designated for the deposit of Proceeds

(including all cash, credit card payments, checks and similar items of payment, deposits and any other amounts contemplated by this Agreement) and proceeds from the sale of Owned FF&E and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). Subject to the provisions of Section 16.12 hereof, the Approval Order shall provide (a) that Merchant grants to Agent a first priority security interest in and lien upon each Designated Deposit Account to the extent of any Proceeds and any other amounts payable to Agent deposited therein, and (b) for turnover to Agent of any such Proceeds (and any other amounts payable to Agent deposited therein) in accordance with the terms and provisions of this Agreement and the Approval Order, as applicable. If, notwithstanding the provisions of this Section, Merchant receives or otherwise has dominion over or control of any Proceeds, or other amounts due to Agent (including proceeds from the sale of Additional Agent Merchandise), Merchant shall hold the same and other amounts in trust for Agent, and shall not deposit such Proceeds or other amounts due Agent hereunder in any account except a Designated Deposit Account or as otherwise instructed by Agent. Until such time as Agent establishes the Agency Accounts (see clause (ii) below), Merchant and Agent shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement that are deposited into the Designated Deposit Accounts.

(ii)    After payment of the Initial Guaranty Payment and delivery of the Letter of Credit, Agent may establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement, and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts. Agent shall exercise sole signatory authority and control with respect to the Agency Accounts. The Agency Accounts shall be dedicated solely to the deposit of Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement, and the distribution of amounts payable hereunder; provided that, in the event (a) Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, and (b) such accounts have amounts deposited therein by Merchant that do not constitute Proceeds and/or other amounts payable to Agent under this Agreement, then Merchant and Agent shall cooperate with each other to establish and implement appropriate steps and procedures to accomplish a daily reconciliation, and remittance to Agent, of all Proceeds (including credit card Proceeds) and other such amounts. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to the Agency Accounts; provided that, in the event Agent elects to continue to use Merchant's Designated Deposit Accounts as the Agency Accounts, Merchant shall deliver to Agent copies of all bank statements and other information relating to such accounts to enable Agent to track and trace deposited funds that constitute Proceeds (including credit card Proceeds) and other amounts contemplated by this Agreement. The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(iii)    Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, and Merchant identification number(s) and existing bank accounts for credit card Proceeds solely for purposes of the Sale, and for processing transactions the sale of the  Owned FF&E.  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures.  Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds (and proceeds from the sale of Owned FF&E) for Agent's own account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to Merchandise and Additional Agent Merchandise sold during the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received, prior to, during or after the Sale Term.

(d)    Commencing on the first (1st) business day following the Payment Date, and continuing on each business day thereafter, Merchant shall, on a daily basis, pay to Agent by wire transfer of immediately available funds all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales and Proceeds from Additional Agent Merchandise) that are deposited into the Designated Deposit Accounts for the prior day.  Agent shall, within a reasonable period of time after the date of each such payment by Merchant, notify Merchant of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of any undisputed shortfall.

(e)    Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after two (2) business days' notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after two (2) business days' notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)    All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later than 2:00 p.m. (prevailing Eastern Time) on the date that such payment is due; provided that, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (prevailing Eastern Time) on the date that such payment is due. In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

(g)     If, and to the extent, the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder (as determined pursuant to the express terms of this Agreement) and such funding or payment cannot be recovered by the Agent from Merchant under Section 3.3(a) or Section 3.3(d), by means of an offset or otherwise, then Merchant agrees to disgorge and remit to Agent the portion, if any, of such amount that is undisputed or that has been determined to be owing to Agent by the Bankruptcy Court within two (2) business days of written demand thereof by Agent.

(h)     <u>Guaranty Security</u>.  To secure payment of the balance of any unpaid portion of the Guaranteed Amount, Expenses and other amounts due to Merchant hereunder, Agent shall deliver to the Merchant an irrevocable standby letter of credit, substantially in the form of Exhibit 3.3(g) attached hereto, in an original stated amount equal to the aggregate of (x) twenty-five percent (25%) of the Estimated Guaranteed Amount, and (y) three (3) weeks' estimated Expenses (the "<u>Letter of Credit</u>"). The Letter of Credit shall name Merchant as beneficiary.  The Letter of Credit shall be delivered no later than the second (2nd) business day following the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant.  In the event that Agent fails to timely pay any undisputed amount hereunder in respect of the Guaranteed Amount, Expenses and/or any other undisputed amounts due by Agent as required under this Agreement, Merchant shall be entitled to draw on the Letter of Credit to fund such undisputed amount after five (5) business days' written notice to Agent. The Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount; provided, however, until the Final Reconciliation has been completed, under no circumstances shall the face amount of the Letter of Credit be reduced to an amount less than two (2) weeks' estimated Expenses (and Merchant shall cooperate with respect to each such request). The Letter of Credit shall expire no earlier than sixty (60) days after the Sale Termination Date; provided that, if, as of the tenth (10th) business day prior to the scheduled expiration date of the Letter of Credit, there remains any unresolved dispute as to the Guaranteed Amount and/or Expenses Agent shall cause the expiration date of the Letter of Credit to be extended for successive thirty (30) day intervals (or such other longer duration as Merchant and Agent may agree) until the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount and/or Expenses have been paid to Merchant. If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the expiration date of the Letter of Credit (as may have been extended previously), Merchant shall have the right to make a drawing under the Letter of Credit in an amount equal to the undisputed amount(s) Merchant asserts are then owing to Merchant. After completion of the Final Reconciliation and payment in full of all amounts owing by Agent (including but not limited to the Guaranteed Amount and Expenses), Merchant shall surrender the original Letter of Credit to the issuer thereof together with written notification that the Letter of Credit may be terminated.

<u>Section 4</u>.     <u>Expenses of the Sale</u>

13

4.1    Expenses.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  Agent and Merchant may review or audit the Expenses at any time.  Agent shall be obligated to pre-fund any payroll-related expenses consistent with Merchant's customary payroll funding practices and timing.  As used herein, "Expenses" shall mean the Store-level (and where expressly applicable, Distribution Center-level) operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)    (i) actual Occupancy Expenses for the Stores (that are in operation of each such date) on a per location, per category, and per diem basis in an amount not to exceed the per location, per category, per diem amount set forth on Exhibit 4.1(a) hereto plus (ii) the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale to the extent set forth on Exhibit 4.1(a), solely to the extent set forth on Exhibit 4.1(a) (in each case as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1);

(b)    actual wages and commissions for all Store-level Retained Employees used in conducting the Sale for actual days/hours worked during the Sale Term including during the Inventory Taking at the respective Stores;

(c)    actual amounts payable by Merchant for benefits for Retained Employees (including payroll taxes, FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) for Store-level Retained Employees used in the Sale, in an amount up to twenty-two percent (22%) of base payroll (including commissions) for the Retained Employee in the Stores (the "Benefits Cap");

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    regardless of whether incurred prior to the Sale Commencement Date, all costs and expenses associated with Agent's on-site supervision of the Stores and Distribution Center (to the extent applicable), including but not limited to any and all fees, wages, bonuses, deferred compensation, taxes, and third party payroll costs and expenses of Agent's field personnel, travel to, from or between the Stores and Distribution Center (to the extent applicable), and all out-of-pocket and commercially reasonable expenses relating thereto;

(f)    regardless of whether incurred prior to the Sale Commencement Date, the costs and expenses associated with all signage, banners, sign walkers, and interior and exterior signs that are produced for the Sale (inclusive of the Signage Costs provided for in Section 16.11), the cost of email blasts and operating the website;

(g)    regardless of whether incurred prior to the Sale Commencement Date, promotional costs including, without limitation, sign walkers,  television, ROP, other advertising and direct mail attributable to the Sale and ordered or requested by Agent;

(h)    the costs and expenses of obtaining additional supplies used at the Stores

14

as may be required by Agent in the conduct of the Sale;

       (i)     postage/overnight delivery/courier charges to and from or among the Stores to the extent relating to the Sale;

       (j)     credit card and bank card fees, chargebacks, and discounts;

       (k)     any and all costs of moving, transferring, or consolidating Merchandise between the Stores and/or Additional Agent Merchandise to and between the Stores;

       (l)     a pro rata portion for the Sale Term of Merchant's premiums in respect of general liability, casualty, property, inventory, and other insurance policies attributable to the Merchandise and the Stores;

       (m)     third-party payroll processing fees;

       (n)     armored car service and security personnel;

       (o)     actual cost of Agent's capital, reasonable legal expenses in connection with the negotiation, entrance into and performance under this Agreement and the transactions contemplated hereby (even if incurred prior to the Sale Commencement Date or after the Sale Termination Date), letter of credit fees and insurance (as provided in Section 12.4 hereof);

       (p)     Agent's fifty percent (50%) of the third party fees and costs of the Inventory Taking;

       (q)     Central Service Expenses in an amount equal to $10,000 per week (pro-rated for partial weeks) for the Sale Term (payable to Merchant) in respect of the cost of Merchant providing Central Services in accordance with Section 8.1 hereof;

       (r)     except to the extent resulting from Agent's gross negligence, Store cash thefts and other Store cash shortfalls in registers;

       (s)     costs and expenses associated with temporary labor requested or obtained by Agent for purposes of the Sale;

       (t)     to the extent Agent elects to use the Distribution Center as provided for in Section 5.5 hereof, Distribution Centers Expenses;

       (u)     any costs and expenses incurred in connection with the acquisition, ticketing, processing, transporting and delivering of any Additional Agent Merchandise (including costs of goods, any/buyer commissions, shipping costs, supervision fees, travel expenses as they relate to preparation of the Additional Agent Merchandise, and legal expenses); and

(v)       the actual costs and expenses of providing such additional services that Agent in its sole discretion deems appropriate for the Sale.

"Expenses" shall not include: (i) Central Service Expenses in excess of the amount set forth in Section 4.1(s); (ii) Excluded Benefits; (ii) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Section 4.1(a) hereof; or (iii) any costs, expenses or liabilities arising during the Sale Term, other than the Expenses listed above or as otherwise expressly provided for in this Agreement.  All costs or expenses related to the Sale not included as Expenses shall be paid by Merchant promptly when due during the Sale Term.  Notwithstanding anything to the contrary herein, (x) to the extent that any Expense listed in Section 4.1 is also included on Exhibit 4.1(a), then Exhibit 4.1(a) shall control and such Expense shall not be double counted. Notwithstanding anything herein to the contrary, Agent shall not have any obligation to pay any Expenses (including, without limitation, Occupancy Expenses and Distribution Center Expenses, to the extent applicable) with respect to any Store or the Distribution Center after the earlier of the Sale Termination Date and the applicable Vacate Date for such Store or Distribution Center.  Notwithstanding anything herein to the contrary, Agent shall not have any obligations to pay any Expenses with respect to Distribution Center other than the Distribution Center Expenses, and in such instance only to the extent Agent elects to use the Distribution Center as provided for in Section 5.5 hereof.

As used herein, the following terms have the following meanings:

"Distribution Center Expenses" means actual expenses paid in connection with the provision of Distribution Center Services during period between the date Agent elects to use the Distribution Center pursuant to Section 5.5 hereof, and the effective date of any written notice from Agent during the Sale Term that states that Agent that it no longer needs access to or use of the Distribution Center.

"Central Service Expenses" means costs and expenses for Merchant's Central Services.

"Central Services" means those Merchant central administrative services necessary for the conduct and support of the Sale, including, but not limited to, use or and access to Merchant's: (i) inventory control system, (ii) payroll system, (iii ) accounting system, (iv) office facilities, (v) central administrative services and personnel to process and perform sales audit, banking, and other normal course administrative services customarily provided to or for the benefit of operating the Distribution Center and/or the Stores, (vi) such other central office services reasonably necessary (in the reasonable judgment of Agent) for the Sale (including, without limitation, MIS and POS Services and cash reconciliation), and (vii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale.

"Excluded Benefits" means (i) the following benefits to the extent accruing or attributable to the period prior to the Sale Commencement Date or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions

and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

"Occupancy Expenses" means rent, percentage rent, common-area maintenance, landlord promotional fees, real estate and use taxes, merchant association dues and charges, HVAC, utilities, telecom/telephone charges, Store security systems, routine repairs and maintenance, taxes and licenses, costs of all local, long-distance and international telephone, satellite or broadband connections, T-1 lines, broadband internet, and other telecommunications services, trash removal, snow removal, third party cleaning, pest control services, and all other categories of expenses at the Stores as set forth on Exhibit 4.1(a) attached hereto and in an amount up to the specific amounts set forth on Exhibit 4.1(a) attached hereto and calculated in accordance with Section 4.1(a), plus any percentage rent obligations incurred by Merchant under applicable leases or occupancy agreements that are allocable to the sales as part of the Sale during the Sale Term of: (x) Merchandise,  and (y) Additional Agent Merchandise included in the Sale. Merchant and Agent agree that Exhibit 4.1(a) shall specify the actual applicable percentage and any applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s). Merchant and Agent further agree that in the event Exhibit 4.1(a) does not specify the actual applicable percentage and/or the applicable sales thresholds in respect of percentage rent under any applicable Store lease(s) or other occupancy agreement(s), Agent shall have no obligation to pay percentage rent other than as set forth on Exhibit 4.1(a).

"Third-party" means, with reference to any Expenses, a party that is not affiliated with or related to Merchant.

4.2    Payment of Expenses.  From and after the Sale Commencement Date, Agent shall be responsible for the payment of all Expenses, whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount. All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided herein, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7(a) below, based upon invoices and other documentation reasonably satisfactory to Merchant and Agent.

Section 5.    Inventory Valuation; Merchandise.

5.1    Inventory Taking.

(a)    Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a keyed retail and SKU-level physical inventory of the Merchandise located in the Stores and Distribution Center (collectively, the "Inventory Taking"). Subject to the availability of the Inventory Taking Service, Merchant and Agent shall use commercially reasonable efforts to complete the Inventory Taking no later than fourteen (14) days after the Sale Commencement Date (the date of the Inventory Taking at each location being the "Inventory Date" for such location). Merchant and Agent shall jointly employ RGIS or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to

conduct the Inventory Taking in the Stores. The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed upon by Merchant and Agent and made a part of this Agreement as <u>Exhibit 5.1(a)</u> (the "<u>Inventory Taking Instructions</u>").[3]  As an Expense, Agent shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service.  The balance of such fees and expenses shall be paid by Merchant. Except as provided in the immediately preceding sentence, Merchant and Agent shall each bear their respective costs and expenses related to the Inventory Taking; <u>provided that</u>, Agent shall be obligated to pay the payroll and related benefit costs (subject to the Benefits Cap) for Retained Employees used during the Inventory Taking. Merchant and Agent shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the Inventory Taking in each of the Stores, the applicable Store shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking has been completed, as agreed by Merchant and Agent.  The Inventory Taking shall not take place on Saturdays, Sundays and federal holidays.  Merchant and Agent further agree that until the Inventory Taking in each particular Store is complete, neither Merchant nor Agent shall (i) transfer any Merchandise to or from that Store, (ii) move Merchandise within or about the Stores, or (iii) remove any Merchant hang tags, price tickets, inventory control tags, or other indicia of pricing affixed to or related to any Merchandise.  Merchant and Agent shall use their reasonable best efforts to reconcile the Inventory Taking (including, but not limited to, the determination of the aggregate Cost Value of the Merchandise), within twenty-one (21) days after its completion.  In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following completion of the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof).

     5.2   <u>Merchandise Subject to this Agreement</u>.

     (a)   For purposes of this Agreement, including but not limited to the calculation of the Guaranteed Amount, "<u>Merchandise</u>" means all new first quality (other than as expressly set forth below), finished goods inventory that is owned by Merchant, customarily sold to customers in the ordinary course of Merchant's business and located in the Stores on the Sale Commencement Date (or, with respect to Returned Merchandise, received in the Stores by the dates specified in this Agreement), including, but not limited to, (i) Merchandise subject to Gross Rings; (ii) Merchandise located in the Stores on the Sale Commencement Date; (iii) Display Merchandise; and (iv) Defective Merchandise (to the extent Merchant and Agent can mutually agree on the Cost Value applicable thereto).  Notwithstanding the foregoing, "Merchandise" shall not include (1) goods that belong to sublessees, licensees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Additional Agent Merchandise; and (4) furnishings, trade fixtures furniture, and equipment and improvements to real property that are located in the Stores and Distribution Center.

     (b)   As used in this Agreement, the following terms have the respective meanings set forth below:

---

[3] The Inventory Taking Instructions are subject to the prior review and approval of Agent.

"Defective Merchandise" means any item of Merchandise identified and agreed upon by Merchant and Agent during the Inventory Taking as defective in that it is damaged, defective, scratched, soiled, ripped, torn, stained, faded, discolored, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mis-mated or near-sized, parts, items typically sold as a set which are incomplete, or gift with purchase items, or otherwise affected by other similar defenses rendering it not first quality.  Display Merchandise shall not per se be deemed to be Defective Merchandise.

"Display Merchandise" means those items of inventory used in the ordinary course of business as displays or floor models, including inventory that has been removed from its original packaging for the purpose of putting such item on display.

"Excluded Defective Merchandise" means (a) any item of Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose, (b) any item of Defective Merchandise for which the Parties cannot mutually agree upon a Cost Value, or (c) inventory of any kind or nature, wherever located, that was, is, or becomes during the Sale Term subject to a bona fide, credible, written claim of trademark (or other intellectual property) infringement by any third party. Excluded Defective Merchandise located in the Stores shall be identified and counted during the Inventory Taking and thereafter removed from the sales floor and segregated. To the extent that goods in transit to the Stores constitute Excluded Defective Merchandise and such goods arrive at the Stores (despite Merchant's covenant not to ship such goods), such goods shall be identified during the Inventory Taking or, to the extent such goods arrive in a Store after the Inventory Date for such Store, such goods shall be reasonably identified by Agent in writing within five (5) business days of receipt of at such Store.

5.3 Valuation.

(a)    For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (x) Merchant's actual cost without load of such item; (y) Merchant's cost of such item as reflected in the SKU file for such item of Merchandise as reflected on Merchant's inventory item master cost file, entitled "Inventory as of 12-20-15 all stores" (together with all updated files received on or prior to the Sale Commencement Date, the "Cost File"); and (z) the Retail Price for such item of Merchandise.

(b)    "Retail Price" means with respect to each item of Merchandise and "Defective Merchandise", the lowest of the lowest ticketed, selling price, file price, original price, chain retail price, marked, shelf price, hang-tag, stickered, PLU, or other hard-marked price since December 1, 2015 (determined, where applicable, by reference to the Cost File), including any and all point of sale ("POS") activity, but excluding Excluded Price Adjustment (the "Base Retail Price").

(c)    For purposes of calculating Retail Price, if an item of Merchandise has more than one ticketed price, other file price, marked price, shelf price, hang-tag price, stickered price, PLU price, or other hard-marked price, or if multiple items of the same SKU have

different ticketed,  file price, marked, shelf, hang-tag, stickered, PLU, or other hard-marked prices and such pricing does not otherwise qualify as an Excluded Price Adjustment, the lowest ticketed price, other file price, marked price, shelf price, hang-tag price, stickered price, PLU price, or other hard-marked price on any such item shall prevail for such item or for all such items within the same SKU, as the case may be, that are located within the same location (as the case may be, the "Lowest Location Price"), unless it is reasonably determined by Merchant or Agent that the applicable Lowest Location Price was mismarked, normal course markdowns had not been reflected or taken, or such item was priced because it was damaged or marked as "as is," in which case the correct price shall control; provided, however, in determining the Lowest Location Price with respect to any item of Merchandise at a Store, the Lowest Location Price shall be determined based upon the lowest Retail Price for such item on a per Store basis.  No adjustment to Retail Price shall be made with respect to different Retail Prices for items located in different locations.

(d)      "Excluded Price Adjustments" means the following discounts or price adjustments offered by the Merchant:  (i) point of sale discounts or similar adjustments prior to December 1, 2015; (ii) employee discounts; (iii) member or customer appreciation points or coupons; (iv) multi-unit purchase discounts; (v) adjustments for Display Merchandise, damaged, defective or "as-is" items; (vi) coupons (Merchant's or competitors')or "buy one get one" type discounts; (vii) obvious ticketing or marking errors; (viii) instant (in-store) or mail-in rebates; or (ix) similar customer-specific, temporary, or employee non-product specific discounts or pricing accommodations.

(e)      Anything in Section 5.3(a) to the contrary notwithstanding, Merchant and Agent further agree as follows:

(i)      The Cost Value and Retail Price of any item Returned Merchandise shall be the otherwise applicable Cost Value and Retail Price of such item (determined in accordance with Sections 3.1(d) and 5.3(a) above), *multiplied by* the inverse of the prevailing Sale discount in effect on the date such item arrives in the Store  (the "Prevailing Discount Adjustment");

(ii)      Defective Merchandise shall be valued by mutual agreement of the Parties; if the Parties are unable to so agree, or if an item is determined to be Excluded Defective Merchandise, such goods shall be excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder, including, without limitation, calculation of the Guaranteed Amount and Proceeds;

(ii)      Excluded Price Adjustments shall not be taken into account in determining the Cost Value of any item of Merchandise.

(iii)      If the Sale commences prior to the completion of the Inventory Taking at any Store, then for the period from the Sale Commencement Date until the Inventory Date for such Store (the "Gross Rings Period"), Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings") and (ii) cash reports of sales within such Store. Agent and Merchant

shall keep a strict count of register receipts and reports to determine the actual Cost Value and Retail Price of the Merchandise sold by SKU. All such records and reports shall be made available to Merchant and Agent during regular business hours upon reasonable notice. Any Merchandise included in the Sale using the Gross Rings method shall be included in Merchandise using the actual Cost Value of the Merchandise sold plus two percent (2%) shrink provision (the "Shrink Provision").

5.4    Excluded Goods. Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder and shall remove, at Merchant's expense, such goods from the Stores prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable.

5.5    Distribution Center Election. Agent may, in its discretion, elect to resume operations at Merchant's distribution center facility located at 170 W Commercial Avenue, Moonachie, NJ 07074 (the "Distribution Center") for purposes of receiving and processing Additional Agent Merchandise. To the extent that Agent makes such election, Merchant shall exercise reasonable best efforts to assist Agent in procuring Merchant's former employees who worked in the Distribution Center and Agent shall be responsible to reimburse Merchant as a Distribution Center Expense provided for in Section 4.1(t) for the following services: (i) payroll and related employee benefits of all Distribution Center employees as may be designated from time to time by Agent; (ii) the handling, receiving, in-take, storage, ticketing and processing of any Additional Agent Merchandise, (iii) any required supplies in connection with the foregoing; and (iv) the costs of moving, transferring, or consolidating Additional Agent Merchandise between Distribution Center and the Stores (collectively, the "Distribution Center Services").

Section 6.    Sale Term.

6.1    Term. The Sale shall commence at each of the Stores on the first business day after the entry of the Approval Order, but not later than February 5, 2016 (the "Sale Commencement Date"). Agent shall complete the Sale and vacate the premises of each Store in favor of Merchant or its representative or assignee on or before March 31, 2016 (the "Sale Termination Date"). The period beginning on the Sale Commencement Date through and including the Sale Termination Date shall be referred to herein as the "Sale Term". The Sale Termination Date as to any Store may be (a) extended by mutual written agreement of Merchant and Agent or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date (each such notice being a "Vacate Notice"). If Agent fails to provide Merchant with timely notice of an acceleration of the Sale Termination Date for a Store, Agent shall be liable for and shall pay any Occupancy Expenses resulting from such untimely notice.

6.2    Vacating the Stores. Subject to the terms of Section 6.1 hereof, Agent shall provide Merchant with not less than seven (7) days' advance written notice of its intention to vacate any Store (as to each such Store, as applicable, the "Vacate Date"). On the Vacate Date, Agent shall vacate such Store in favor of Merchant or its representatives or assignee, (subject to Agent's right to abandonment) remove all Remaining Merchandise (including any unsold Additional Agent Merchandise) from the Store, and leave such Store in "broom clean"

condition (ordinary wear and tear excepted) subject to the right to abandon, neatly in place, any unsold Owned FF&E. Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Store (as and to the extent applicable) subject to Vacate Notice shall continue only until the earlier of (a) the applicable Vacate Date for such Store or (b) the Sale Termination Date. All assets of Merchant used by Agent in the conduct of the Sale (*e.g.*, FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores, to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent.  Any reference in this Section 6 to vacating the Stores means vacating the Stores, as applicable, in favor of Merchant, its representatives, or assignee and shall not mean vacating possession or disclaimer of lease in favor of the landlord or owner of the Store premises, as applicable.  Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent, or licensee thereof) to any Store during the Sale Term, ordinary wear and tear excepted. Agent shall have the right to abandon in place any asset (other than Merchandise and/or Additional Agent Merchandise) of Merchant (including, without limitation, any unsold Owned FF&E).

Section 7.        [Intentionally Omitted]

Section 8.        Conduct of the Sale.

8.1        Rights of Agent and Merchant.  Subject to the Approval Order and the Sale Guidelines, Agent shall be permitted to conduct a "going out of business," "store closing," "sale on everything," "everything must go" or similarly themed sale at the Stores throughout the Sale Term. Agent shall conduct the Sale in the name of and on behalf of Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and, except as modified by the Approval Order, all governing laws and applicable leases to which Merchant is a party. Agent shall conduct the Sale in accordance with the Sale Guidelines annexed hereto as Exhibit 8.1 and approved by the Approval Order (the "Sale Guidelines"), whether by in-Store promotion, media advertising, or other promotional materials.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business, so long as Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.  In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the following rights, limited by the Sale Guidelines:

(a)        except as otherwise provided in the Approval Order, to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages, or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws;.

(b)        to use without charge during the Sale Term (except where otherwise designated as an Expense pursuant to Section 4.1 hereof), (i) all furniture, fixtures and equipment, (ii) bank accounts, (iii) Store-level (and to the extent available, corporate) computer hardware and software, (iv) customer lists, mailing lists, email lists, website and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for

Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data), (v) existing supplies located at the Stores, (vi) intangible assets (including Merchant's names, logos, and tax identification numbers), (vii) Stores' and, to the extent Agent exercises its election under Section 5.5 of this Agreement, Distribution Center's keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores and, to the extent Agent exercises its election under Section 5.5 of this Agreement, the Distribution Center, and (viii) any other assets of Merchant located at the Stores or, to the extent Agent exercises its election under Section 5.5 of this Agreement, Distribution Center (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and return to Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)     subject to Agent's payment (if applicable) in accordance with Section 4.1(s) above in respect of Central Services, Merchant agrees and covenants that it shall be responsible for performing and providing to Agent such Central Services necessary or incident to the conduct of the Sale, including, but not limited to, use of Merchant's central office facilities, central administrative services, and personnel to process payroll, perform MIS, and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house; provided, however, that, in the event Agent expressly requests Merchant to provide Central Services other than those normally provided to the Stores and/or Distribution Center and relating to the sale of Merchandise by Merchant in the ordinary course of business and as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)     to establish Sale prices and implement advertising, signage (including A-frame, interior and exterior banners and signs and sign walkers), and promotional programs consistent with the sale theme described herein, and as otherwise provided in the Approval Order and the Sale Guidelines, as and where applicable (including, without limitation, by means of media advertising, A-frame, interior and exterior banners, and signs and use of sign walkers and similar signage).

(e)     once the Inventory Taking is complete at both the transferring Store and the receiving Store, to transfer Merchandise between and among the Stores;

(f)     to supplement the Merchandise at the Stores with Additional Agent Merchandise in accordance with Section 8.9 hereof; and

(g)     to conduct the Sale in accordance with the Sale Guidelines attached hereto as Exhibit 8.1.

8.2     Terms of Sales to Customers.  Subject to Agent's compliance with applicable law (as determined with reference to the Approval Order), all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally

recognized credit and debit cards.  Agent shall accept and honor coupons during the Sale Term, if any, and Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term. Merchant shall reimburse Agent in cash for all amounts related to coupons, and Merchant's employee discount terms, during each weekly sale reconciliation provided for in Section 8.7. Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term, so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.

8.3    Sales Taxes.  (a)  During the Sale Term, all sales, excise, gross receipts, and other taxes attributable to sales of Merchandise, Additional Agent Merchandise,  and/or Owned FF&E (except to the extent such sales are exempt) as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise, Additional Agent Merchandise,  and/or Owned FF&E and collected by Agent in trust for Merchant at time of sale and paid over to Merchant. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  If Agent does not timely remit Sales Taxes to Merchant, Merchant shall be permitted to draw on the Letter of Credit in the full amount of Sales Taxes collected by Agent in the preceding week in accordance with Section 3.3(g).  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections. Agent shall add Sales Tax to the sales price of all Additional Agent Merchandise sold and Agent shall collect Sales Taxes attributable to the sales of Additional Agent Merchandise and deposit such amounts into existing accounts, trust accounts, or other accounts designated by Agent, for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant and its officers, directors, employees, agents and independent contractors (collectively, "Merchant Indemnified Parties") from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines, or penalties that Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and remit them to Merchant (including, without limitation, any collection of Sales Taxes in an amount less than required under applicable Law) and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, any taxing authority, or any other party, and Merchant  shall indemnify and hold harmless Agent and its officers, directors, employees, agents and Supervisors (collectively, "Agent Indemnified Parties") from and against all claims, demands, assessments, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.

(b)    Without limiting the generality of Section 8.3(a) hereof (including without limitation, Agent's obligation to collect and pay over to Merchant an amount equal to all Sales Taxes payable in connection with the Sale), the Parties agree that because Agent will conduct the Sale solely as agent for Merchant, the various payments that this Agreement contemplates (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4    <u>Supplies</u>.  Agent shall have the right to use all existing supplies necessary to conduct the Sale (<u>e.g.</u>, boxes, bags, and twine, but not gift certificates, rain checks, merchandise credits, or the like) located at the Stores at no charge to Agent.  In the event that additional supplies are required in any of the Stores during the Sale Term, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; <u>provided</u>, <u>however</u>, that if reasonably requested by Agent, Merchant shall assist Agent in obtaining supplies, at Agent's expense, from Merchant's vendors at Merchant's usual and customary costs for such supplies.  Merchant does not warrant that Merchant's existing supplies as of the Sale Commencement Date are adequate for purposes of the Sale.

8.5    <u>Returns of Merchandise</u>.  During the Sale Term (the "<u>Pre-Sale Merchandise Return Period</u>"), Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date in accordance with Merchant's return policies in effect at the time of purchase (to the extent presented in accordance with the foregoing terms, each such item being defined herein as "<u>Returned Merchandise</u>").  Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise. To the extent Returned Merchandise is salable as first quality merchandise, it shall be included in Merchandise and for purposes of the calculation of the Guaranteed Amount shall be as follows: at a value equal to the product of (x) the applicable Cost Value and Retail Price attributable to such item as provided for above, multiplied by (y) the Prevailing Discount Adjustment applicable to such item.  Subject to Merchant's reimbursement to Agent of the amount of any Store credit or refund granted for any such Returned Merchandise, the aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly. If the Returned Merchandise is not first quality goods, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Cost Value attributable thereto; <u>provided</u> <u>that</u>, in the event Merchant and Agent cannot agree on the Cost Value to be attributed to any particular item(s) of Returned Merchandise, than such item(s) shall be segregated form Merchandise and excluded from the Sale and treated as Excluded Defective Merchandise for all purposes hereunder. Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the weekly Sale reconciliation pursuant to Section 8.7(a) hereof.  Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent as part of the weekly Sale reconciliation provided for under Section 8.7(a) hereof.

8.6.    <u>Gift Cards; Merchandise Credits;</u>

(a)     Agent shall accept Merchant's gift cards, gift certificates, merchandise credits, "fast cash" and other similar Merchant-issued credits until February 9, 2016.  Merchant shall reimburse Agent in cash for gift card, gift certificate, merchandise credit, and other similar Merchant issued credit amounts redeemed during the Sale Term as part of the weekly sale reconciliation provided for in Section 8.7(a).

8.7.   Sale Reconciliation.

(a)     Weekly Reconciliation.  On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Merchant and Agent shall cooperate to reconcile Expenses, Gross Rings, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), pursuant to procedures agreed upon by Merchant and Agent.  On a weekly basis, Agent shall also provide Merchant with a report (in electronic format acceptable to Merchant) of all sales of Additional Agent Merchandise, which report shall detail by Store, at a minimum, gross and net sales and type of items sold. To ensure accurate sales audit functions, Agent shall use Merchant's existing point-of-sale system for recording all sales (including any sales of Additional Agent Merchandise) in the Stores.

(b)     Final Reconciliation.

(i)     Within thirty (30) days after the Sale Termination Date applicable to the last Store in which the Sale is concluded, Merchant and Agent shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, Expenses, proceeds of Owned FF&E and any other accountings required hereunder (the "Final Reconciliation").  Within five (5) days after completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent (the "Final Reconciliation Settlement Date").  In the absence of an order of the Bankruptcy Court to the contrary, no disputed amounts owing hereunder shall be paid until the dispute has been resolved by agreement of the Parties or as determined in the manner prescribed in Section 8.7(b)(ii) hereof.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes, Additional Agent Merchandise, proceeds of Owned FF&E, Expenses, and other Sale-related items to review and audit such records.

(ii)     In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the fifth (5th) business day following a request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.  In the event of a dispute as to (x) or (y) above, Agent shall extend the Letter of Credit in accordance with the provisions of Sections 3.3 hereof.  If Agent has for any reason not so extended the expiration date of the Letter of Credit by the date that is ten (10) business days prior to the applicable expiration date (as may have been extended previously), Merchant shall have the right to make a drawing under the Letter of Credit in an amount or amounts equal to the undisputed amounts Merchant asserts are then owing to Merchant in accordance with the terms of Section 3.3(g).

8.8    Force Majeure.  If any casualty, act of war or terrorism, or act of God prevents the conduct of business in the ordinary course at any Store for a period in excess of five (5) consecutive days (a "Force Majeure Event"), such Store and the Merchandise located at such Store shall be eliminated from the Sale and considered to be deleted from this Agreement as of the first date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale that is not the subject of insurance proceeds or consolidated by Agent into another Store(s) and, to the extent Agent has paid the Guaranteed Amount, Merchant to the extent such insurance proceeds are actually received, shall reimburse Agent for the amount by which the Guaranteed Amount is so reduced prior to the end of the Sale Term.  If a Store is eliminated from the Sale due to a Force Majeure Event, Agent will use its commercially reasonable efforts to transfer therefrom all Merchandise that is not the subject of insurance proceeds and include such Merchandise in the Sale at other Stores.

8.9    Additional Agent Merchandise

(a)    Agent shall be entitled to include in the Sale supplemental merchandise procured by Agent which is of like kind, and no lesser quality than Merchandise located in the Stores (the "Additional Agent Merchandise").

(b)    Agent agrees that Additional Agent Merchandise, if any, shall be procured from either Merchant's existing vendors ("Existing Vendors") or third party vendors who are not Existing Vendors ("Third Party Vendors") that sell merchandise of like kind, and no lesser quality to the Merchandise.  Agent shall be responsible for payment of the costs associated with procuring, marketing and selling the Additional Agent Merchandise as an Expense of the Sale.

(c)    The Additional Agent Merchandise shall be at all times subject to the control of Agent.  If requested by Agent, Merchant shall, at Agent's expense as an Expense, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(d)    Any transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant.  Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Merchandise shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code in effect in the State of New York (the "UCC").  Agent is hereby granted a first priority security interest in (i) the Additional Agent Merchandise and (ii) the Additional Agent Merchandise proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver any notices and file any financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Merchandise (and any proceeds from the sale thereof) as consigned goods

27

thereunder and the Merchant as the consignee therefor, and Agent's security interest in such Additional Agent Merchandise and Additional Agent Merchandise proceeds).

Section 9.    Employee Matters.

9.1    Merchant's Employees.  Subject to the applicable provisions of the Approval Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's Store employees in the conduct of the Sale to the extent Agent deems expedient, and Agent may select and, with Merchant, schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such Store employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date.  Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.  Merchant and Agent agree that except to the extent that wages, payroll taxes, benefits, and other costs relating to the employment of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims, and other termination-type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto), nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

9.2    Termination of Employees by Merchant.  Agent may in its discretion stop using any Retained Employee at any time during the Sale.  In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for termination "for cause" (such as dishonesty, fraud, or breach of employee duties), in which case the seven (7) day notice period shall not apply; provided, however, that Agent shall promptly notify Merchant of the basis for such "cause".  During the Sale Term, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld). Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's treatment of such Retained Employees.

9.3    Payroll Matters.  Subject to Section 4.1 hereof, during the Sale Term Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday prior to the date on which such payroll is payable (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained

Employees plus related payroll taxes, workers' compensation and benefits for such week, in the amount to the extent required by Section 4.1.

9.4    Employee Retention Bonuses.  Agent shall pay, as an Expense hereunder, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable) up to a maximum of approximately fifteen percent (15%) of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause", as Agent shall determine.  The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall, subject to the limitations set forth above, be in an amount to be determined by Agent, in its discretion, and shall be processed through Merchant's payroll system. Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within five (5) business days after the Sale Commencement Date.  Agent shall not utilize the Retention Bonus as a mechanism to encourage Retained Employees to act contrary to Merchant's best interests.

Section 10.    Conditions Precedent.

10.1    Conditions to Agent's Obligations.  The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(a)    All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)    No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated by this Agreement (including, without limitation, the Sale);

(c)    The Bankruptcy Court shall have entered the Approval Order, in substantially the form annexed hereto as Exhibit 10.1(c), on or before February 4, 2016; and

(d)    Merchant shall have executed this Agreement in the space provided therefor.

10.2    Conditions to Merchant's Obligations. The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Merchant:

(a)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred solely as a result of Agent's conduct at and as of the date hereof and as of the Sale Commencement Date;

(b)      The Bankruptcy Court shall have entered the Approval Order on or prior
to February 4, 2016;

(c)      No injunction, stay or restraining order shall be in effect prohibiting the
consummation of the transactions contemplated by this Agreement (including, without
limitation, the Sale); and

(d)      Agent shall have executed this Agreement in the space provided therefor.

Section 11.    <u>Representations, Warranties and Covenants</u>.

11.1    <u>Merchant's Representations, Warranties, and Covenants</u>.  Merchant hereby
represents, warrants, and covenants in favor of Agent as follows:

(a)      Merchant (i) is a corporation duly organized, validly existing, and in good
standing under the laws of the State of Delaware; (ii) has all requisite power and authority to
own, lease, and operate its assets and properties and to carry on its business as presently
conducted and to grant the rights intended to be granted herein as provided herein; and (iii) is,
and during the Sale Term will continue to be, duly authorized and qualified to do business and in
good standing in each jurisdiction where the nature of its business or properties requires such
qualification, including all jurisdictions in which each Store is/are located, except, in each case,
to the extent that the failure to be in good standing or so qualified could not reasonably be
expected to have a material adverse effect on the ability of Merchant to execute and deliver this
Agreement and perform fully its obligations hereunder.  Merchant is not in violation of
certificate of incorporation or bylaws, or in violation (or with or without notice or lapse of time
or both would be in violation), in any way with any term or provision of any law, statute,
ordinance, rule, regulation, order, writ, judgment, injunction, permit or decree applicable to
Merchant or any of its assets, operations or properties that would prevent or materially impair
Merchant's consummation of the transactions contemplated by this Agreement.  Subject to the
entry of the Approval Order, the execution and delivery by Merchant of this Agreement and the
other agreements and instruments contemplated hereby does not, and compliance by the
Merchant with the terms hereof and thereof compliance by Merchant with the terms hereof and
consummation of the transactions contemplated hereby will not, require Merchant to obtain any
authorization, consent, approval, exemption or action of, or make any filing with or give any
notice to, any court or administrative or governmental body or any other person or entity
pursuant to the certificate of incorporation or bylaws Merchant or any law, statute, rule,
regulation, agreement, permit, license, instrument, order, judgment or decree to which the
Merchant or any of their assets is subject, except for any such authorization, consent, approval,
exemption, action of or filing with the failure of which to be obtained could not reasonably be
expected to have a material adverse effect on the ability of Merchant to execute and deliver this
Agreement and perform fully its obligations hereunder.

(b)      Subject to the entry of the Approval Order, Merchant has the right, power,
and authority to execute and deliver this Agreement and each other document and agreement
contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and
to perform fully its obligations hereunder.  Subject to the entry of the Approval Order, Merchant

has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale except for any such authorization, consent, approval, exemption, action of or filing with the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Subject to the issuance and entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid, and binding obligation of Merchant, enforceable in accordance with its terms.  Subject to the entry of the Approval Order, no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party that has not been obtained is required therefor, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Other than any consent as shall be obtained prior to the Sale Commencement Date, and any contracts or agreements identified by Merchant to Agent on or prior to the Sale Commencement Date, subject to entry of the Approval Order, no contract or other agreement to which Merchant is a party or by which Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)      Merchant has not replenished the Stores in the normal course consistent with its normal course since December 24, 2015.

(d)      Merchant (i) except as set forth on Exhibit 11.1(d), owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise, and Owned FF&E which, subject to entry of the Approval Order, will be free and clear of all liens, claims, and encumbrances of any nature other than any of the foregoing created hereunder; provided that, the liens identified in Exhibit 11.1(d) shall attach to the Guaranteed Amount and such other amounts due Merchant hereunder in the same extent and priority that such liens had in the Merchandise and Owned FF&E; and (ii) Merchant shall not create, incur, assume, or suffer to exist any security interest, lien, or other charge or encumbrance upon or with respect to any of the Merchandise,  Owned FF&E or the Proceeds or the proceeds of the sale of the Owned FF&E, in each case, except for such pre-existing liens and security interests as are created hereunder or as shall have been disclosed by Merchant to Agent and identified in Exhibit 11.1(d) hereof, which liens and security interests shall, pursuant to the Approval Order, attach only to the Guaranteed Amount, Expenses, and any other amounts payable to Merchant hereunder.

(e)      Merchant has maintained its pricing files at all Stores in the ordinary course of business, and prices charged to the public for goods (whether in-Store, by advertisement, or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns, advertised sales, and other customary in-Store promotional or clearance activities).  All pricing files and records (including, without limitation, the Cost File) are, to the Merchant's best

31

knowledge, true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods (without consideration of any point of sale markdowns, advertised sales, and other customary in-store promotional or clearance activities) as of the dates and for the periods indicated therein. All pricing files and records relative to the Merchandise (including, without limitation, the Cost File) have been made available to Agent.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.  Merchant has taken hard markdowns in the ordinary course of business and, to the best of Merchant's knowledge, such hard markdowns are reflected in Merchant's pricing and records (including, without limitation, the Cost File).

        (f)     Merchant shall ticket or mark all items of inventory received at the Stores following the date of this Agreement but prior to the Sale Commencement Date in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

        (g)     To the best of Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state, and local product safety laws, rules, and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.  Merchant owns or possesses all right, title and interest in and to all material permits, licenses, franchises, orders, consents, authorizations, registrations, certificates, variances, exceptions, approvals and similar rights obtained from governments and governmental agencies relating to the Stores or the operations conducted at the Stores, and all deposits or bonds in connection therewith (collectively, the "Permits") that are necessary to own and operate the Stores, including, without limitation, all Permits  required under any federal, state or local law relating to public health and safety, employee health and safety, pollution or protection of the environment, other than in each case failures to so own or possess all right, title and interest that would not prevent or materially impair the Merchant's consumption of the transactions contemplated by this Agreement.  The Merchant is in compliance with the terms and conditions of such material Permits and has received no notices (nor does it have any knowledge of any threatened notice) that it is in violation of any of the terms or conditions of such Permits, except for any noncompliance or violation that would not prevent or materially impair the Merchant's consummation of the transactions contemplated by this Agreement.  Merchant has conducted and continues to conduct its business, in all material respects, in accordance with all applicable laws and governmental orders applicable to Merchant or any of its assets or properties, and to the best of its knowledge Merchant is not in material violation of any such law or governmental order, including, without limitation, any law, now in effect, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, relating to the environment, labor, health, safety or hazardous materials, except for any noncompliance or violation that would not prevent or materially impair the Merchant's consummation of the transactions contemplated by this Agreement.

(h)    Subject to the provisions of the Approval Order, during the Sale Term, Agent shall have (i) the right to the unencumbered use and occupancy of, and peaceful and quiet possession of the Stores, the utilities and other services provided at the Stores and the assets currently located at the Stores; and (ii) access to, and, to the extent Agent exercises its election under Section 5.5 of this Agreement, the right to use, the  Distribution Center and the Distribution Center Services (which access and right to use shall be ensured by Merchant)  for purposes of receiving and processing Additional Agent Merchandise.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair (at its own expense) all cash registers, heating systems, air conditioning systems, elevators, escalators, alarm systems and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Stores.  Except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, throughout the Sale Term, Merchant shall remain current on all post-petition expenses and payables necessary for the conduct of the Sale.

(i)    Subject to the Approval Order, Merchant has paid and shall continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Stores' employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)    Supplies have not been, since December 1, 2015, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business (as Merchant has been operating the business during the period immediately preceding the execution of this Agreement).

(k)    Since December 1, 2015, Merchant (i) has not marked up or raised (and shall not, up to the Sale Commencement Date, mark up or raise) the price of any items of Merchandise, (ii) has continued to mark down prices of Merchandise in accordance with normal course activity, (iii) has sold inventory during such period at customary prices consistent with the ordinary course of business, and has not promoted or advertised any sales or in-Store promotions (including, without limitation, POS promotions) to the public other than as described on Exhibit 11.1(k) (in all cases whether or not consistent with Merchant's ordinary course of business consistent with historic periods), and (iv) has not removed or altered any tickets or any indicia of clearance merchandise or POS promotion, except in the ordinary course of business (as Merchant has been operating the business during the period immediately preceding the execution of this Agreement).

(l)    Except for (i) the Bankruptcy Case and (ii) the matters set forth on Exhibit 11.1(l), no action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that would reasonably be expected, if adversely determined, to materially impair or prevent the conduct of the Sale.

(m)    Except as set forth in Exhibit 11.1(m): (i) Merchant is not a party to any collective bargaining agreements with its employees; (ii) no labor unions represent Merchant's employees at Distribution Center or at any Store; and (iii) to Merchant's knowledge, there are currently no strikes, work stoppages, or other labor disturbances affecting Distribution Center or any Store, or Merchant's central office facilities.

(n)    Since December 1, 2015, Merchant has not taken, and, except as expressly permitted pursuant to the other terms and provisions of this Agreement, shall not throughout the Sale Term take, any actions with the intent of increasing (or the result of which is to increase materially) the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(o)    Since December 1, 2015, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein (including as described in Sections 8.10 and 11.1(c)), through the Sale Commencement Date   Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business (as operated as of the date hereof) including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business and not promoting or advertising any sales or in-Store promotions (including, without limitation, POS promotions) to the public (in all cases whether or not consistent with Merchant's ordinary course of business consistent with historic periods); (ii) not returning inventory, supplies, fixtures, furniture or equipment to vendors and not transferring inventory or supplies out of or to the Stores; and (iii) except as may occur in the ordinary course of business (as Merchant is operating immediately prior to the date hereof), not making any management personnel moves or changes at the Stores.

(p)    To Merchant's knowledge, formed after reasonable inquiry, all documents, written information and written supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(q)    Except as indicated on Schedule 11.1(q) hereto, no Store lease or similar occupancy agreement has expired, nor shall expire at any time until the conclusion of the Sale Term in such Store (by its terms or otherwise).

(r)    Merchant has not since December 1, 2015, knowingly shipped any Excluded Defective Merchandise from the Distribution Center to the Stores.  Merchant will use all commercially reasonable efforts to avoid shipping any Excluded Defective Merchandise from the date of this Agreement from the Distribution Center to the Stores.

(s)    Merchant (i) at the Sale Commencement Date will have sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) to consummate the transactions contemplated by this Agreement and the other Agency Documents, (ii) at the Sale Commencement Date will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the other Agency Documents, and (iii) at the Sale Commencement Date, will not have incurred any

obligation, commitment, restriction or liability of any kind which would impair or adversely affect such funds, resources and capabilities.

(t)     Merchant shall not from the date of this Agreement forward, offer any promotions or discounts at the Stores.

(u)     No investigation or due diligence conducted by Agent shall limit, modify or negate any of the foregoing representations or warranties.

11.2   <u>Agent's Representations, Warranties and Covenants</u>.  Agent hereby represents, warrants, and covenants in favor of Merchant as follows:

(a)     Each member of Agent (i) is a limited liability company duly and validly existing and in good standing under the laws of each of their formation; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Agent has the right, power, and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid, and binding obligation of Agent enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforceability is consider in a proceeding in equity or at law). No court order or decree of any federal, provincial, state, or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice, or legal, administrative, or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)      Agent has committed, immediately available funds sufficient to enable Agent to pay the Guaranteed Amount and fully pay, perform, and satisfy all of Agent's obligations under this Agreement.

Section 12.      Insurance.

12.1      Merchant's Liability Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability, and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall use commercially reasonable efforts to cause Agent to be named an additional insured with respect to all such policies. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal, or material change. In the event of a claim under any such policies, (a) Merchant shall be responsible for the payment of all deductibles, retentions, or self-insured amounts to the extent such claim arises from or relates to the alleged acts or omissions of Merchant or its employees (other than Retained Employees), agents (other than Agent's employees), or independent contractors (other than Agent and Supervisors hired by Agent in conjunction with the Sale) and (b) Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts (which amounts shall constitute Expenses) to the extent such claim arises from or relates to the alleged acts or omissions of Agent or its employees, agents, or independent contractors, including Retained Employees.

12.2      Merchant's Casualty Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft, and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise, and shall use best efforts to cause Agent to be named an additional insured with respect to all such policies. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise and/or Additional Agent Merchandise (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal, or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date (as may be extended from time to time as set forth herein) without Agent's prior written consent.

12.3      Worker's Compensation Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4    <u>Agent's Insurance</u>.  As an Expense of the Sale, Agent shall maintain throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under such policies, Agent shall be responsible for the payment of all deductibles, retentions, or self-insured amounts thereunder, to the extent such claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or Supervisors.

12.5    <u>Risk of Loss</u>.  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Agent shall not be deemed to be a successor employer.  Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees, and other persons arising from events occurring at the Stores during and after the Sale Term except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Stores (an "<u>Agent Claim</u>").  In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

<u>Section 13</u>.    <u>Indemnification</u>.

13.1    <u>Merchant Indemnification</u>.  Merchant shall indemnify and hold Agent and each Agent Indemnified Party harmless from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    Subject to Agents' performance of its payment obligations under this Agreement, any failure of Merchant to pay to its employees any wages, salaries, or benefits due

to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)    subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)    any consumer warranty or products liability claims relating to Merchandise;

(e)    any liability or other claims asserted by customers, any of Merchant's employees or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or the WARN Act) in connection with the Sale and/or from events occurring at the Stores during and after the Sale Term (except to the extent constituting an Agent Claim);

(f)    any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; and

(g)    the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent), or representatives.

The indemnification obligations set forth in this Section 13.1 shall be in addition to (and shall not limit) any other indemnification obligations of Merchant set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

13.2    <u>Agent Indemnification</u>.  Agent shall jointly and severally indemnify and hold harmless Merchant and the Merchant Indemnified Parties from and against all claims, demands, penalties, losses, liability, or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Merchant resulting from or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of Agent):

(a)    Agent's material breach of or failure to comply with any Safety Laws (as defined in the Approval Order) or any of its agreements, covenants, representations, or warranties contained in any Agency Document;

(b)    any harassment, discrimination, or violation of any laws or regulations or any other unlawful, tortious, or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors, Supervisors, or other officers, directors, or representatives of Agent;

(c)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)    any Agent Claims;

(e)    any taxes and penalties arising out of Agent's failure to collect and/or remit to Merchant correct amounts of Sales Taxes (including any such failure resulting from Agent's use of any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale);

(h)    the gross negligence, willful misconduct, or fraud of Agent or any of its officers, directors, employees, agents, or representatives; and

(i)    any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Merchandise.

The indemnification obligations set forth in this Section 13.2 shall be in addition to (and shall not limit) any other indemnification obligations of Agent set forth in this Agreement, including without limitation those set forth in Section 8.3(a).

Section 14.    Defaults.

The following shall constitute "Events of Default" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)    Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term;

(c)    The filing of a motion by any party to covert or the conversion of the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the filing of a motion by any party to appoint or the appointment of a chapter 11 trustee; or

(d)    Subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at three (3) or more Stores for any reason other than (i) an Event of Default by Agent or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party (in the case of (a) or (b) above, or the Agent in the case of (c) or (d) above) may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not effected by the defaulting party.

Section 15.    Fixtures.

(a)    With respect to any furniture, fixtures and equipment (including, but not limited

to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking owned by Merchant and located at the Closing Locations (collectively, the "Owned FF&E"), Agent shall, at Merchant's election (the "FF&E Sale Option") to be exercised on the date immediately prior to the Sale Commencement Date, either (i) sell the Owned FF&E strictly on a commission basis (the "FF&E Commission Option"), or (ii) sell the Owned FF&E on a guaranteed fee basis (the "FF&E Guaranty Option"); provided that, the FF&E Guaranty Option shall be subject to the Merchant and Agent agreeing on a mutually acceptable FF&E/asset listing; provided further that, prior to Merchant's exercise of the FF&E Sale Option, Merchant shall have the right to exclude the FF&E located in some or all of the Stores identified on Exhibit 15(a) attached hereto, in which case the FF&E in such locations shall be excluded from the FF&E Commission Option and/or the FF&E Guaranty Option (the "Excluded Store FF&E") and Agent shall not sell such Excluded Store FF&E and it shall be left in place at the affected Stores on the applicable Sale Termination Date. For the avoidance of doubt, Merchant must exercise either the FF&E Commission Option or the FF&E Guaranty Option. Merchant shall exercise the aforementioned FF&E Sale Option by written notice to Agent by the date that is not later than ten (10) calendar days after the Sale Commencement Date (such date being defined as the "FF&E Sale Election Deadline"). In the event Merchant elects the FF&E Commission Option, Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds from the sale of such Owned FF&E ("Agent's FF&E Commission"); provided, however, in such case Merchant shall be responsible for payment of expenses incurred in connection with the disposition of the Owned FF&E ("FF&E Disposition Expenses") in accordance with a budget to be mutually agreed by Merchant and Agent ("FF&E Disposition Budget"), and all proceeds realized from the disposition of the Owned FF&E, after deduction of applicable sales taxes, Agent's FF&E Commission, and the FF&E Disposition Expenses (collectively, the "Net FF&E Proceeds"), shall be paid to Merchant. In the event Merchant elects the FF&E Guaranty Option, Agent shall pay Merchant a lump sum payment in an amount to be agreed upon between Merchant and Agent (hereinafter, the "FF&E Guaranty Amount"), in which case all costs and expenses associated with the disposition of Owned FF&E shall be borne by Agent, and all proceeds realized from the sale or other disposition of the Owned FF&E (after payment of the applicable FF&E Guaranty Amount and net of any applicable sales taxes) shall be retained by Agent for its sole account.

(b)      Anything in this Agreement to the contrary notwithstanding, Agent shall be authorized to abandon any and all unsold Owned FF&E (and all other furniture, fixtures, and equipment at the Stores and the corporate office) in place without any cost or liability to Agent. Agent shall have no responsibility whatsoever with respect to furniture, fixtures, and equipment located at the Stores and/or corporate office which are not owned by Merchant.

(c)      Merchant hereby represents to Agent that: (i) subject to the Approval Order, all Owned FF&E may be sold by Agent on Merchant's behalf, free and clear of all claims, liens and encumbrances of any kind; and (ii) all such Owned FF&E is devoid of Hazardous Materials.

(d)      Anything in this Agreement to the contrary notwithstanding, Agent will not have any obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any Hazardous Materials that may be located at the Stores and/or corporate office. Agent shall have no liability to any party for any environmental action brought: (i) that is

related to the storage, handling, treatment, disposition, generation, or transportation of Hazardous Materials, or (ii) in connection with any remedial actions associated therewith or the Stores and/or corporate office. Merchant (and not Agent) shall be solely responsible to remove from the Stores and/or corporate office all Hazardous Materials. For purposes of this Agreement, the term "Hazardous Materials" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. 9601(14), as a "hazardous substance", (ii) the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste", or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public health or welfare or to the environment or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation.

Section 16.    Miscellaneous.

16.1    Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by e-mail, and/or a recognized overnight delivery service, as follows:

>       If to Agent:
>
>       GORDON BROTHERS RETAIL PARTNERS, LLC
>       101 Huntington Avenue, 10th Floor
>       Boston, MA 02199
>       Attention: Michael Chartock
>       Fax: (617) 531-7906
>       Email: mchartock@gordonbrothers.com
>
>       With a copy to (which shall not constitute notice):
>
>       Goulston & Storrs PC
>       400 Atlantic Avenue
>       Boston, Massachusetts 02110
>       Attention: James F. Wallack, Esq.
>       Fax: (617) 574-4112
>       jwallack@goulstonstorrs.com
>
>       If to Merchant:
>
>       JOYCE LESLIE, INC.
>       170 W Commercial Avenue
>       Moonachie, NJ  07074
>       Attn:   Lee Diercks
>       Tel:    (941) 321-9056
>       Email: ldiercks@gwfglaw.com

41

With a copy to (which shall not constitute notice):
Goldberg Weprin Finkel Goldstein LLP
1501 Broadway, 22nd Floor
New York, New York 10036
Kevin Nash, Esq.
Tel:    (212) 221-5700
Email: Knash@gwfglaw.com

16.2    <u>Governing Law; Consent to Jurisdiction</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles thereof.  The Parties hereto agree that the Bankruptcy Court (and the District Court and Circuit Court of Appeal with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3    <u>Entire Agreement</u>.  This Agreement, the Exhibits hereto, and the Agency Documents (subject, in each instance, to the Approval Order) contain the entire agreement between the Parties with respect to the transactions contemplated hereby and supersede and cancel all prior agreements, including but not limited to all proposals, letters of intent, or representations, written or oral, with respect thereto.

16.4    <u>Amendments</u>.  This Agreement, the Exhibits hereto, and the Agency Documents may not be modified except in a written instrument executed by each of Merchant and Agent.

16.5    <u>No Waiver</u>.  No party's consent to or waiver of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of Agent and Merchant, including but not limited to any chapter 11 or chapter 7 trustee.  No party to this Agreement shall be permitted to assign its obligations under this Agreement.

16.7    <u>Execution in Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9    Survival.  All representations, warranties, covenants and agreements made herein shall be continuing, shall be considered to have been relied upon by the Parties and shall survive the execution, delivery, and performance of this Agreement; provided, however, the representations and warranties of the Parties shall survive and continue only until completion of the Final Reconciliation, after which such representations and warranties shall lapse and cease to be of any further force effect except to the extent that the Party in whose favor they are given delivers written notice of breach thereof to the Party asserted to be in breach prior thereto.

16.10.    Termination.  This Agreement may be terminated at any time before the Sale Commencement Date as follows:

(a)    upon written notice by Agent or Merchant, if the Sale Commencement Date has not occurred on or prior to February 4, 2016  and the failure of the Sale Commencement Date to occur is not caused by or the result of a material breach of this Agreement by the party giving such notice;

(b)    by mutual written consent of the Merchant and the Agent;

(c)    automatically and without any action or notice by either Agent or Merchant, immediately upon the occurrence of any of the following events:

(i)    the issuance of a final and non-appealable order by any agency, division, subdivision, audit group, procuring office, or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state thereof, any foreign government or state or any municipal or other political subdivision thereof to restrain, enjoin, or otherwise prohibit the transaction(s) contemplated hereby; or

(ii)    approval by the Bankruptcy Court of, or the filing by or on behalf of Merchant of a motion or other request to approve, any financing, refinancing, acquisition, divestiture, sale, public offering, recapitalization, business combination or reorganization of or involving all or any material part of the Merchandise (other than any transaction with Agent or an affiliate of Agent) or any standalone plan of reorganization for Merchant involving the retention of any material portion of the Merchandise (an "Alternative Transaction"); or

(iii)    Agent is not approved by the Bankruptcy Court as the Successful Bidder after completion of the Auction (each as defined in the Bid Procedures) conducted pursuant to the Bid Procedures and the Bid Procedures Order; or

(iv)    Merchant's Bankruptcy Case being converted into a case under Chapter 7 of the Bankruptcy Code or dismissed;

(d)    upon written notice by Agent:

(i)    if Agent is not in material breach of this Agreement and there has been a material violation or breach by Merchant of any representation, warranty, covenant or agreement contained in this Agreement that (A) has rendered the satisfaction of any condition to the obligations of Agent set forth in Section 10.1 impossible, (B) has not been waived by Agent, and (C) is not capable of being cured or, if capable of being cured, is not cured in all material respects within seven (7) days following receipt of written notification thereof by Agent; or

(ii)    if the Bankruptcy Court does not enter the Approval Order on or prior to February 4, 2016.

(e)    upon written notice by Merchant:

(i)    if Merchant is not in material breach of this Agreement and there has been a material violation or breach by Agent of any representation, warranty, covenant or agreement contained in this Agreement that (A) has rendered the satisfaction of any condition to the obligations of Merchant set forth in Section 10.2 impossible, (B) has not been waived by Merchant, and (C) is not capable of being cured or, if capable of being cured, is not cured in all material respects within seven (7) calendar days following receipt of notification thereof by Merchant; or

(ii)    if the Bankruptcy Court does not enter the Approval Order on or prior to February 4, 2016.

In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination; provided, however, that nothing in this Section 16.10 shall be deemed to release any party from liability for any breach of its obligations under this Agreement

16.11    Expense Rembursement/Signage Cost Reimbursement.

(a)    Agent shall reimburse the reasonable costs, fees, and expenses actually incurred and paid by Stalking Horse (as defined in the Bid Procedures) in acquiring signage and other advertising and promotional material in connection with the Sale (excluding any cost of capital incurred in connection therewith), in an aggregate amount not to exceed $60,000 (the "Signage Costs Reimbursement"), which costs, fees and expenses shall be Expenses of the Sale.

(b)    Upon Agent's payment to Stalking Horse of any Signage Costs Reimbursement (incurred after January 26, 2016) and/or assumption and payment of Stalking Horse's obligations to the signage vendor (as the case may be), Merchant shall cause the Stalking Horse to make any such signage and other promotional materials available to Agent, as applicable; provided further that the costs of shipping and/or delivery associated with the aforementioned signage shall be borne by Agent and shall be Expenses of the Sale.

(c)    Subject to approval of the Bankruptcy Court, in consideration for Agent having expended considerable time and expense in connection with this Agreement and the negotiation thereof and to compensate Agent in the event that this Agreement is terminated

pursuant to Section 16.10(a), Section 16.10(e)(ii), Section 16.10(c)(ii), Section 16.10(c)(iii) or Section 16.10(d)(i), Merchant shall pay and Agent shall receive, (1) reimbursement of customary, reasonable documented third-party fees, costs and expenses, including legal fees, incurred by Agent in connection with this transaction in an aggregate amount equal to $10,000 (the "Bid Protections").

(d)    Subject to approval of the Bankruptcy Court, the Bid Protections shall have administrative expense claim status in the Bankruptcy Case pursuant to Section 507 of the Bankruptcy Code, senior to all other administrative expense priority claims, shall be secured by a first-priority lien on the Agent Collateral and shall be paid in cash within three (3) business days after the termination hereof giving rise to such Bid Protections.  Following the occurrence of the Sale Commencement Date for a Sale conducted by Agent, Merchant shall have no liability with respect to the Bid Protections.

16.12   Agent's Security Interest.

(a)    In consideration of and effective upon payment by Agent of the Initial Guaranty Payment on the Payment Date and delivery of the Letter of Credit, Merchant hereby grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) all Proceeds (including, without limitation, credit card Proceeds); (iii) in the event Merchant elects the FF&E Guaranty Option, the Owned FF&E and the proceeds realized from the sale or other disposition of Owned FF&E after payment of the FF&E Guaranty Amount; or, alternatively, Agent's FF&E Commission; (iv) Agent's percentage share of Proceeds, and (v) all "proceeds" (within the meaning of Section 9-102(a)(64) of the UCC) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder. Upon entry of the Approval Order, payment of the Initial Guaranty Payment on the Payment Date, and delivery of the Letter of Credit, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(b)    Without any further act by or on behalf of the Agent or any other party (including (without limitation) Merchant), the Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests Merchant shall cooperate with Agent with respect to all filings (including, without limitation, UCC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(c)    Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent.

(d)    In the event of a Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the UCC.

16.13  <u>Further Assurances</u>.   From time to time, and without further consideration, the parties hereto covenant and agree that they shall execute and deliver, or shall cause to be executed and delivered to the other, such other instruments of transfer and conveyance and other documents and take such other actions as the other  may reasonably request as necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement (including satisfaction of all closing conditions that are within their respective control and reasonably cooperating with the Sale), and shall lend all reasonable assistance to  the other in the carrying out of the intentions and purposes of this Agreement.  Each party further covenants and agrees that it shall promptly deliver to the other all such information and documents in their respective possession or control as the other shall reasonably request. For the avoidance of doubt, nothing in this Section 16.13 shall be deemed to require any party hereto to (i) execute or deliver any document or instrument under this Section 16.13 or take any action which would impose on them any monetary or other obligations or liability not directly imposed upon them pursuant to the other provisions of this Agreement, (ii) join in any litigation or proceeding not expressly contemplated or required by the other provisions of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By: _____

    Name: _____

    Title: _____

**MERCHANT:**

**JOYCE LESLIE, INC.**

By: _____

    Name:

    Title: