UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:                                                                                  Chapter 11

JOYCE LESLIE, INC.                                                         Case No. 16-22035 (RDD)

                                              Debtor.
---------------------------------------------------------------x

# DEBTOR'S OBJECTION TO CLAIM 371 FILED BY
# MIDWAY INDUSTRIAL TERMINAL LLC

Joyce Leslie, Inc. (the "Debtor"), as and for its Objection to the proof of claim (No. 371) filed by Midway Industrial Terminal LLC ("Midway") in the total amount of $3,727,438.41, respectfully states and alleges as follows:

## Preliminary Statement

1.   Midway, as the former landlord of the Debtor's main offices and warehouse in Moonachie, NJ, has asserted a multi-million dollar claim arising out of the rejection of the Debtor's underlying office and warehouse lease. Midway's alleged claim goes well beyond the amounts allowed under the Bankruptcy Code formula for rejection damages, and must be reduced significantly to no more than $548,269.83, subject to Midway's affirmative and continuous duty to mitigate losses, which may be a disabling ground in and of itself.

2.   As set forth below, Midway not only miscalculates the monetary cap imposed on rejection claims by Section 502(b)(6) of the Bankruptcy Code, but also fails to properly apply the cap to the various allowed charges. The end result is that Midway's claim is badly overstated in multiple respects, and must be reduced.

1

## Background

3.  On January 9, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and thereafter has continued in possession and management of its assets as a debtor-in-possession.

4.  The Debtor previously operated a small chain of 47 women's clothing stores, selling a variety of junior apparel located throughout the Northeast.

5.  During the Chapter 11, the Debtor liquidated all remaining store inventory and sold many of the store leases under various sales. The Debtor was able to accumulate net cash, which is now available for distribution to creditors pursuant to a proposed Amended Plan of Liquidation, currently scheduled for confirmation on February 10, 2017.

6.  During the auction process, the Debtor rejected several leases for stores that could not be sold, and vacated its main offices on March 31, 2016. Accordingly, the Debtor's main office lease with Midway was rejected as of that date and the Debtor vacated possession of the premises.

## The Midway Lease

7.  More than fifteen years ago, the Debtor first maintained its headquarters at 135 West Commercial Avenue, Moonachie, NJ pursuant to a lease dated December 6, 1996 with Midway's predecessor (the "Original Lease").

8.  Thereafter, the Debtor moved its headquarters from 135 West Commercial Avenue to a neighboring property at 170 West Commercial Avenue, Moonachie, NJ, also owned by Midway's predecessor.

9.  Because both buildings were owned by the same entity, when the Debtor moved to 170 West Commercial Avenue it entered into a short-form amended lease that carried

2

forward substantially all of the terms of the Original Lease with a few specific amendments, including a new term of ten years from December 1, 2009 and ending November 30, 2019 (the "Amended Lease").

10. In the meanwhile, Midway subsequently acquired the property at 170 West Commercial Avenue and became the Debtor's main landlord prior to bankruptcy.

11. As of the Petition Date (January 9, 2017), the Debtor's base rent under the Amended Lease was $40,852.37 per month, plus payment of $13,170.12 for additional rent consisting of real estate taxes and insurance. In lieu of a security deposit, the Amended Lease provided for a letter of credit in the amount of $100,000 issued by Sterling National Bank, as Successor to Hudson Valley Bank, NA.

12. By Order dated March 24, 2016 (ECF #243), this Court vacated the automatic stay to permit Midway to draw down on the $100,000 letter of credit, which constitutes a credit to its final allowed claim.

13. By Notice dated March 24, 2016 (ECF #242), the Debtor rejected the Amended Lease, effective as of March 31, 2016. All post-petition base rent and additional rent was paid through the date of rejection.

14. On May 23, 2016, Midway filed its alleged Claim in the amount of $3,727,438.41, representing modest pre-petition rent and additional rent of less than $15,000; purported damages arising from the rejection of the Amended Lease under Section 502(b)(6), and a series of additional charges. A copy of the Claim (without the Original Lease or Amended Lease) is annexed hereto as <u>Exhibit</u> "A".

15. More particularly, Midway seeks the following amounts: (a) $14,952.63 in pre-petition rent and real estate taxes; (b) alleged rejection damages equal to one years' rent of

3

$490,228.44; (c) alleged "holdover rent" defined in paragraph 24 of the Original Lease as four times the rent and additional rent for the last month of tenancy and calculated by Midway at $269,221.24; (d) purported additional rent of $937,452.03 running through October 31, 2019; (e) alleged surrender and restoration costs of $478,044.70; (f) various late charges and "rights to perform" interest charges totaling $1,607,139.23; and (g) legal fees in the amount of $30,400.13.

16.  These charges are astronomically high in comparison to the Bankruptcy Code formula, and must be expunged or reduced significantly to a core calculation equal to one year's actual rent (base rent plus additional rent), with no add-on charges or other exotic items, such as holdover rent or surrender and restoration costs.

### The Midway Claim Should Be Expunged or Reduced

#### A.  Statutory Formula Under Section 502(b)(6)

17.  Midway's rejection claims are governed by Section 502(b)(6) of the Bankruptcy Code, which established a well-known "cap" on the allowed amount of a landlord's claim arising from rejection of a lease in bankruptcy, generally limited to one year's rent reserved.  In enacting the Section 502(b)(6) formula, it was the express intent of Congress to strike a balance between potentially huge landlord claims for unmatured rent resulting from terminated leases that would dwarf other claims in bankruptcy. *In re Andover Togs, Inc.*, 231 B.R. 521 (Bankr. S.D.N.Y. 1999).

18.  Section 502(b)(6) provides in relevant part:

(6)  if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
(A)  the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
(i)   the date of the filing of the petition; and
(ii)  the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

4

(B)   any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

### B. Midway's Duty to Mitigate

19.   Moreover, before the statutory cap even applies, the Court must consider whether the landlord attempted to mitigate damages by using good faith efforts to obtain a replacement tenant. The Original Lease and Amended Lease are both governed by New Jersey law, which imposes a duty to mitigate on commercial landlords. *In re Cornwall Paper Mills Co.*, 169 B.R. 844, 852 (Bankr. D.N.J. 1994). "There is no question that in New Jersey commercial lessors are obligated to mitigate their damages in the same way as residential lessors . . . The imposition of the obligation to mitigate damages is consonant with public policies of denying the injured party the opportunity to sit idly by and exacerbate damages; discouraging economic and physical waste and encouraging the use of vacant property. *Fanarjian v. Moskowitz,* 237 N.J.Super. 395, 404, 568 A.2d 94 (App.Div.1989)").

20.   Both the Second and Third Circuit Courts of Appeal have held that there is a duty to mitigate under the Bankruptcy Code. *Adelphia Bus. Sols., Inc. v. Abnos,* 482 F.3d 602, 610 (2d Cir. 2007)("We are also unpersuaded by the proposition that because Abnos had no duty to mitigate his losses from breach of the lease under Missouri law . . . the bankruptcy court should not have considered whether he could relet . . . under Missouri law he may be entitled to damages from the breach occasioned by the rejection without any penalty for not mitigating his losses. This rule of contract law, however, is beside the point; it does not affect the bankruptcy court's equitable consideration of the practical effect of Abnos' ability to protect himself by reletting the premises."); *In re PPI Enterprises (US), Inc.*, 324 F.3d 197 (3d Cir. 2003).

5

21. Here, Midway completely ignored its obligation to mitigate under state law and the Bankruptcy Code and suggests that it is automatically entitled to a rejection claim. Midway is wrong; and the failure to mitigate is grounds alone to disallow the claim.

### C. Potential Allowed Charges Consistent with the Cap

22. Even if Midway can show reasonable efforts at mitigation, the claim is still well above the cap. In practical terms, implementation of the cap requires two determinations. First, the Court must determine which parts of the claim are properly included under the ambit "rent reserved" for purposes of Section 502(b)(6). This analysis defines the outer limits of the cap.

23. Second, the Court must examine the various components of the landlord's claim to determine whether (and to what extent) the components are subject to the cap. In other words, the cap applies to all types of damages arising directly out of a lease termination, even those items that go beyond convention notions of rent reserved. The cap does not apply to unpaid arrears during possession, which are separately recoverable under Section 502(b)(6), nor to damages suffered by the landlord separate and apart from the termination of a lease. The cap sets the outer limit of termination related damages, even if the landlord suffered actual damages arising from termination in excess of the cap.

24. For the purposes of this Objection, subject to establishing mitigation, the Debtor is prepared to recognize that the following items are part of the calculation the cap:

|   |   |   |
|---|---|---|
| a. | Base Rent for one year | $490,228.44 |
| b. | Real estate taxes for one year | $132,103.10 |
| c. | Insurance for one year | $25,938.29 |
|   | Subtotal | $648,269.83 |
|   | Less Security | $100,000.00 |
|   | Cap | $548,269.83 |

6

**D. Charges Not Included in the Calculation of the Cap**

25. A number of Midway's charges flow from rejection of the lease, but fall outside of the calculation of the cap because they do not qualify as "rent reserved" or "pure rent" within the meaning of Section 502(b)(6).

26. To begin with, charges for various "operating expenses" asserted by Midway, including utilities, landscaping and routine repairs and maintenance do not qualify as "rent reserved" even though they are specified as "additional rent" under the Original Lease.

27. Caselaw is clear that simply defining various charges as "additional rent" is not sufficient to include them in the calculation of the cap. *Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91, 99 (B.A.P. 9th Cir.1995), *overruled on other grounds, In re El Toro Materials Co., Inc.*, 504 F.3d 978 (9th Cir. 2007) ("It is also apparent that bankruptcy courts must make an independent determination of what constitutes "rent reserved" because labels alone may be misleading.").

28. Accordingly, the courts have fashioned a three part test to determine if an item charged under a lease is truly "rent reserved" for the purposes of Section 502(b)(6):

> 1) The charge must: (a) be designated as "rent" or "additional rent" in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;
> 2) The charge must be related to the value of the property or the lease thereon; and
> 3) [T]he charge must be properly classifiable as rent because it is fixed, regular or periodic charge.

*In re McSheridan*, *supra*. at 99. This test has been adopted in New York. *See, In re Rock & Republic Enterprises, Inc.*, 2011 WL 2471000 (Bankr. S.D.N.Y. June 20, 2011); *In re Andover Togs, supra,* 231 B.R. at 521.

7

29. Here, the operating expenses fail the second *McSheridan* test because they are related to the use of the Premises, and not the value of the Premises. *See, e.g., In re Foamex Intern., Inc.*, 368 B.R. 383, 391-392 (Bankr. De. 2007); *In re Rose's Stores, Inc.*, 179 B.R. 789 (Bankr. E.D.N.C. 1999)(neither utilities nor general maintenance obligation is rent reserved). Accordingly, they are not considered in fixing the cap on Midway's claim.

30. Midway also erroneously denominates "holdover rent" of $269,221.24 as part of the "rent reserved" calculation for cap purposes. In fact, under Paragraph 24, at the end of the Amended Lease term, at Midway's election, the Debtor must either restore the premises to its pre-Amended Lease condition, or pay a "holdover rent" equal to four times the rent and additional rent for the last month of tenancy, which Midway calculates at $269,221.24. Despite being designated as "rent", holdover rent fails the third test, as it is neither regular nor periodic. Thus, it is not part of the cap calculation of "rent reserved".

31. None of the other components of the claim, including the "surrender and restoration" charge, late fees, right to perform, or legal fees are defined in the Original Lease or the Amended Lease as "additional rent", nor do they meet the other two tests for "rent reserved". *See, e.g. In re Rock & Republic Enterprises, Inc., supra; In re PPI Enterprises (US), Inc.*, *supra*. Thus, these charges are not part of the cap calculation.

32. On the other side of the equation, Midway incorrectly omits real estate taxes and insurance in the calculation of the cap, as these two charges clearly meet all three tests. The Debtor has acknowledged these charges in its recognized potential claim, as noted above.

33. Thus, the cap is fixed by calculation of one year's rent, plus real estate taxes and insurance. All other charges alleged in the Claim are not "rent reserved" and are excluded from the calculation of the cap. As set forth in the chart appended to the Claim, at the

8

time of the rejection, rent was $40,852.37 per month, the real estate taxes were $11,008.59 per month and insurance was $2,161.52 per month, for a one year total of $648,269.83.

34. The cap must then be reduced by the $100,000 letter of credit held as security for the rent, which was released to Midway, leaving a total cap of $548,269.83.

### E. Proper Calculation of Midway's Claim

35. Midway's application of the cap to its Claim is equally flawed, as it seeks to improperly exclude a number of charges that are, in fact, subject to the cap, without analyzing the nuances of Section 502(b)(6).

36. For example, the operating expenses of utilities, landscaping and repairs are all additional rent under the Original Lease, and the claim for future charges of these operating expenses arises out of the lease termination. Because these charges are irregular and not true reserved rent, they are omitted from the calculation of the cap, and must also be disallowed to the extent that they exceed the cap measured by rent reserved. *See, In re Foamex Intern., Inc., supra.*

37. As noted above, the Claim also includes charges for "Surrender and Restoration", being Midway's estimated cost of restoring the premises to pre-lease condition, which Midway also excludes from the cap. The Debtor objects to this charge on the dual grounds that it is not valid under the Original Lease, and even if it is allowable, it is also subject to the cap, and thus must be disallowed to the extent that these items exceed the cap as measured by rent reserved.

38. Under Paragraph 24, at the end of the Amended Lease term, at Midway's election, the Debtor must either restore the premises to its pre-Amended Lease condition, or pay the "Holdover Rent". Since, the Holdover Rent is clearly designed to reimburse Midway in the

9

event the premises are not restored by the Debtor following termination, Midway is not entitled to <u>both</u> the Holdover Rent and Midway's estimated $478,044.70 cost of restoration. A copy of Paragraph 24 is annexed hereto as <u>Exhibit</u> "B" for the Court's ready reference.

40. Importantly, however, both Holdover Rent and the Surrender and Restoration charges only arise upon the termination of the Amended Lease, and so both are subject to the cap, although they do not fall within the definition of "rent reserved and are therefore not included in the calculation of the cap. *See, e.g., In re Foamex Intern., Inc., supra.*

40. A similar analysis applies to the claim for late charges and "right to perform" damages. Although the latter is styled as the landlord's right to perform a covenant breached by the tenant, it is, in fact, a 2% interest charge on all unpaid additional rent and legal fees, and is included in addition to the 3% late charge on base rent. Both of these claims clearly arise because of the termination of the lease, and must be subject to the same cap as the rent and additional rent upon which they are based. *See, In re Wigley*, 533 B.R. 267, 272 (B.A.P. 8th Cir. 2015)("If the lease had not been terminated, Lariat would not have a claim for future rents, and without a claim for future rents, Lariat would not have a claim for interest thereon. Lariat's claim for interest on its future rents thus resulted from termination of the lease and is subject to § 502(b)(6)(A)'s cap.")

41. Midway also seeks legal fees in the amount of $30,400.13, for which only a summary is provided. It appears that these fees were incurred in connection with the rejection of the Lease and the surrender of the premises, and therefore are termination expenses subject to the cap. *See, In re Rock & Republic Enterprises, Inc., supra* at *25.

42. Finally, Midway seeks alleged unpaid rent and real estate taxes for the stub period between January 1, 2016 and the Chapter 11 filing on January 9, 2016. While these

charges are not subject to the cap, s*ee, e.g., In re Rock & Republic Enterprises, Inc.*, *supra* *17, in fact, the stub rent was paid in full prior to rejection.

43. Thus, all charges included in the Claim relating to post-petition damages are either subject to the cap, or should be disallowed for other reasons as set forth above. There are no components of the cap that are both allowable and outside of the cap. The proper allowance or disallowance of the Claim is set forth in the following Chart, based upon the correct cap calculation of $548,269.83 [Base Rent of $$490,228.44 + Real estate taxes $132,103.10 + insurance of $25,938.29 = $648,269.83 less the $100,000 letter of credit = $548,269.83].

| Component of Claim | Part of Cap Calculation Yes/No | Status of Charge | Amount Claimed | Amount Allowed and Subject to Cap |
|---|---|---|---|---|
| Post-Petition base rent | Yes | Allowed and part of the calculation of the cap | $490,228.44 | $490,228.44 |
| Real Estate Taxes | Yes | Allowed and part of the calculation of the cap | $484,378.02 | $132,103.10 |
| Insurance | Yes | Allowed and part of the calculation of the cap | $95,107.08 | $25,938.29 |
| Utilities | No | Disallowed even though it arises from termination of the lease because it exceeds the cap | $262,307.29 | $0.00 |
| Landscaping | No | Disallowed even though it arises from termination of the lease because it exceeds the cap | $28,547.59 | $0.00 |
| Repairs and Maintenance | No | Disallowed even though it arises from termination of the lease because it exceeds the cap | $67,112.05 | $0.00 |
| Surrender & Restoration | No | Disallowed as invalid under the lease, and because in any event it exceeds the cap | $478,044.70 | $0.00 |
| Holdover rent | No | Disallowed even though it arises from termination of the lease because it exceeds the cap | $269,221.24 | $0.00 |

11

| | | | | |
|---|---|---|---|---|
| Right to perform | No | Disallowed even though it arises from termination of the lease because it exceeds the cap | $1,272,389.23 | $0.00 |
| Late Charges | No | Disallowed even though it arises from termination of the lease because it exceeds the cap | $334,750.00 | $0.00 |
| Legal Fees | No | Disallowed even though it arises from termination of the lease because it exceeds the cap | $30,400.13 | $0.00 |
| Pre-Petition Rent | No | Disallowed as previously paid. | $14,952.63 | $0.00 |
| Subtotal | | | $3,827,438.40 | $648,269.83 |
| Less Security | | | ($100,000) | ($100,000) |
| Final Claim | | | $3,727,438.40 | $548,269.83 |

**WHEREFORE**, the Debtor respectfully prays for the entry of an Order consistent with the foregoing, and granting such other relief as may be just and proper.

Dated:  New York, New York
        February 8, 2017

                                          GOLDBERG WEPRIN
                                          FINKEL GOLDSTEIN, LLP
                                          Attorneys for the Debtor
                                          1501 Broadway, 22nd Floor
                                          New York, New York 10036
                                          (212) 221-5700

                                    By:   /s/ Kevin J. Nash